[No. S119066. June 6, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE A. SALAZAR, Defendant and Appellant.
In re JOSE A. SALAZAR, on Habeas Corpus.

1032

**COUNSEL**

Gail Harper, under appointment by the Supreme Court, for Petitioner and for Defendant and Appellant.

Kenneth I. Clayman, Public Defender (Ventura) and Michael C. McMahon, Chief Deputy Public Defender, for California Public Defenders Association as Amicus Curiae on behalf of Petitioner and Defendant and Appellant.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, David P. Druliner and Robert R. Anderson, Chief Assistant Attorneys General, Carol Wendelin Pollack and Pamela C. Hamanaka, Assistant Attorneys General, Linda C. Johnson, Scott A. Taryle, Donald E. De Nicola, Robert F. Katz, Roy C. Preminger, John R. Gorey and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

Steve Cooley, District Attorney (Los Angeles), Curt Livesay, Chief Deputy District Attorney, Lael Rubin, Head Deputy District Attorney, and Brent Riggs, Deputy District Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—A jury found petitioner Jose A. Salazar guilty of killing 11-month-old Adriana Krygoski, who had been left in his care, and convicted him of second degree murder and assault on a child resulting in death. While his appeal was pending (B117225), he filed a petition for writ of habeas corpus (B137034) in which he alleged, inter alia, that the Los Angeles County District Attorney's Office withheld and was withholding exculpatory information in the form of evidence to impeach the forensic pathologist who testified at his trial, Dr. James Ribe, in violation of *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194] (*Brady*). The Court of Appeal issued an order to show cause, remanded the matter to the trial court for an evidentiary hearing, and ultimately granted relief in a published opinion.

Although the Court of Appeal failed to discuss an essential element of a *Brady* claim—i.e., whether the district attorney's office had suppressed the allegedly exculpatory evidence—we decline to remand the matter to the Court of Appeal for reconsideration because we also find that the evidence allegedly suppressed was not "material" within the meaning of *Brady*. We therefore reverse the judgment of the Court of Appeal.

### BACKGROUND

Around 7:30 a.m. on November 18, 1996, Kimberly Krygoski dropped off her 11-month-old daughter, Adriana, with the babysitter, Joanne Moreau. Adriana had been playing in her crib after waking up. She had a couple of bruises on her forehead but was otherwise healthy.

Moreau found Adriana to be a "fussy" eater that morning and, when she put the baby down for a nap, thought she might be developing a cold. As Moreau prepared to leave the house to run some errands, she planned to take the sleeping baby along, but petitioner offered to stay and take care of her instead.[1] Moreau checked on Adriana just before leaving. Adriana lifted her head, and Moreau noticed that her eyes were red. She took Adriana's temperature, which was normal, and examined her. Other than the cold symptoms, the baby seemed to be "fine," so she let Adriana go back to sleep. Moreau left Adriana alone with petitioner around 10:20 a.m.

At 11:46 a.m., petitioner called 911 to report that Adriana was barely breathing, that her body was shaking, and that she did not seem to know "where she's at." When the paramedics arrived seven minutes later, they found Adriana lying in the hall, next to a large amount of vomit. Her

---

[1] Petitioner, who was the boyfriend of Moreau's daughter, Sheree Beckwith, had been staying at Moreau's apartment since his outpatient shoulder surgery two weeks earlier.

breathing was very shallow, and she had no muscle control. Petitioner appeared calm and said he did not know what had happened.

By the time Adriana arrived at the emergency room at Northridge Hospital, she was unresponsive and was making only minimal respiratory efforts. Dr. Harold Lowder felt a "very boggy" area in the back of her head, which indicated a serious injury. Adriana never regained consciousness.

Petitioner told Dr. Lowder that Adriana had had a choking episode while he was feeding her and that she may have subsequently had a seizure. The CT scan, however, indicated substantial head injuries—subdural hematoma, brain swelling, and skull fractures—that could have been caused only by extreme force, such as an auto accident or beating and shaking of the child.

Dr. Lowder opined that the injuries had been caused by 10 to 15 seconds of moderately severe shaking of the baby, possibly with her head striking against a hard surface. In his experience, injuries of this severity were caused by an auto accident, a fall from a great height, or violence—and, in each case, the loss of consciousness was immediate. It would not have been possible for Adriana to have sustained these "extremely severe" injuries days or even hours earlier, nor could these injuries have been self-inflicted or the result of a fall onto a table.[2] Had the paramedics not been called, Adriana would have died within minutes. Because the history petitioner recounted was inconsistent with the injuries Dr. Lowder observed, he asked the hospital staff to contact the police.

Dr. Gilbert Mellin, a radiologist at Northridge Hospital, examined the CT scan and agreed that Adriana's multiple skull fractures were the product of multiple severe impacts. The injuries could not have been caused by a bump on a coffee table or a fall from a bed or high chair, nor could they have been self-inflicted or accidental.

Dr. Dorothy Calvin, a pediatric ophthalmologist, examined Adriana and found her optic nerves were swollen from edema. She opined that Adriana's injuries had been inflicted deliberately, most likely by shaking, and agreed with the other experts that they could not have been self-inflicted or the product of a fall.

---

[2] Earlier that morning, while petitioner's girlfriend was watching her, Adriana fell and hit the side of her head on the coffee table, but she quickly recovered her spirits and was laughing and having a good time. The previous week, Adriana fell and hit her forehead on the table while learning to walk, but once again she recovered and continued playing.

Adriana was declared brain dead on November 20, 1996, at 4:00 a.m. and was taken off life support a few hours later.

Meanwhile, petitioner gave several statements to police.

He told Officer Jaime Chacon that he had tried to feed Adriana because she was crying, but she threw up. When her eyes started "acting funny," he tried to cheer her up by tossing her into the air a couple of times. He called 911 when she did not improve.

After petitioner was arrested, he told Officer Chris Mezich that he had been playing with Adriana in the living room and that he had fed her about half a jar of baby food when she suddenly started coughing, choking, and spitting up green vomit. He called 911 when her eyes started blinking rapidly and rolled back in her head.

Petitioner told Detective Terry Lopez that he brought Adriana to the living room when she woke up from her nap crying; that he was feeding her from a jar of baby food when she knocked the spoon from his hand and spit food onto his T-shirt and shorts; that he went to the kitchen to get paper towels to clean up; that she crawled towards the bedroom while he was in the kitchen; that he next heard her choking and gasping for air; and that she rolled over onto her side, her eyes flickering, and then went limp, vomited, and appeared to have a seizure.

At Lopez's request, petitioner also prepared a written statement of the morning's events. In the statement, petitioner wrote that Adriana woke up crying around 10:45 a.m. She looked sad and tired, so petitioner stroked her head and tried to play with her. Around 11:25 a.m. he fed her. Adriana was swallowing slowly, but he kept feeding her until she threw her spoon at him. When he went to the kitchen to get her milk, she crawled away but suddenly started making faces and noises. Her body grew stiff but her head was loose, so he started rubbing her head, chest, and back. She failed to respond, so he put a cold towel on her head and neck. He lifted her up and down two or three times. He then called 911, and "they told me what was wrong with her but I don't remember." He placed Adriana on her left side, as he was instructed to do, and then she vomited. Before he could give her mouth-to-mouth resuscitation, the paramedics arrived.

During a subsequent interview with Lopez, petitioner said that after Adriana knocked the spoon from his hand, he picked her up, shook her three

times while asking her why she was so "fussy," and threw her in the air three times. When he put her back on the ground, she crawled away. Then she became rigid and started to vomit. Her eyes rolled back in her head.

The next day, petitioner told Detective William Mahle that after Adriana had knocked the spoon from his hand, he picked her up, held her in front of him, and asked, "Why are you doing this? Why don't you eat?" He demonstrated a shaking motion as he explained what he had done.

### Testimony of Dr. James Ribe

Dr. James Ribe, a senior deputy medical examiner in the Los Angeles County Coroner's Office and the forensic pathologist who performed the autopsy, testified that the cause of death was head trauma. He observed a very large subdural hematoma, which was caused by a violent rotational movement of Adriana's head, probably in a front-to-back, back-to-front direction. He also noted hemorrhaging of the optic nerve sheaths and the retina as well as a spinal cord contusion, both of which are suggestive of shaken-baby syndrome. The subarachnoid hemorrhage was caused by a combination of shaking and the violent impact of the back of Adriana's head against a hard, flat surface. The contrecoup contusion above her right eye suggested a fall from a great height or a forcible impact of the back of her head against a hard surface. The length and scope of the skull fractures, as well as indentations in Adriana's skull, indicated a tremendous amount of force must have been used, akin to an auto accident or a fall from the third story of a building. These injuries were probably inflicted by throwing, slamming, or swinging the back of Adriana's head against something hard.

Dr. Ribe opined that these injuries were inflicted in a few seconds and that Adriana lost consciousness "[e]ssentially instantaneously" thereafter. Her eyes would have rolled back. The vomiting could have happened right away or have been delayed 30 to 60 minutes. A seizure immediately following or within minutes was possible. Adriana would have been in a "devastated" condition from the moment she received these injuries and would not have been able to eat, talk, or walk, nor would she have drifted in and out of consciousness. Without medical attention, she would have survived no more than two hours.

Ribe also reviewed the CT scan, which was performed at 12:46 p.m. on the day Adriana was admitted to the hospital. Although the CT scan by itself might support the inference that the injuries were inflicted four or more hours earlier, the pathologic findings confirmed that the injuries must have been inflicted more recently.

*Defense Evidence*

Petitioner denied shaking Adriana violently or hurting her in any way. He claimed that he could not have inflicted her injuries because he was still recovering from outpatient shoulder surgery performed two weeks earlier.

Petitioner testified that on the day of the murder, he left the apartment around 9:00 a.m. to drive his girlfriend to work. He returned about an hour later. Petitioner offered to take care of Adriana while Moreau ran her errands. He sat down to watch television and dozed off. He did not remember what time Moreau left the apartment.

Suddenly, petitioner heard Adriana screaming and crying. He entered the bedroom to find her sitting against the wall, crying hard. She looked tired and her eyes were red. He asked her what was wrong, picked her up with his right hand, and brought her to the living room. He changed her diaper, which lessened the crying. He tried to play with her, making faces, and then left her sitting on the floor for 15 minutes while he watched television. Petitioner noticed that Adriana was just sitting there, so he tried to talk to her and play with her, but she looked ready to go back to sleep. She was just blinking, not paying attention.

Petitioner next fed her some vegetables. Adriana ate very slowly, with food dripping out of her mouth. Adriana also spit some food on his clothes. Her eyes were red and she looked only half-awake, so he put down the spoon[3] and decided not to feed her anymore. Because there was food on his sweats and shorts, he cleaned himself up and then noticed that Adriana still looked as though she were "somewhere else." Petitioner tried again to play with her. When she failed to respond, he picked her up and asked her what was wrong. He claimed he lifted her up to shoulder height and back down three or four times and then returned her to the floor. While he went to get her bottle, she moved a couple of feet, but her body began shaking. She was hitting the back of her head on the floor. Petitioner picked her up again and noticed, apparently for the first time, that her head was "loose." He stroked her head and put her back down to get some ice to put in a towel for her. When he put the cold compress on her chest and head, the shaking stopped, but she started to make gurgling noises, so he called 911. He called 911 a second time after Adriana threw up.

Dr. Charles Imbus, a pediatric neurologist, relied on the edema in the CT scan in concluding that Adriana's injuries must have been inflicted at least

---

[3] Petitioner denied that Adriana knocked the spoon out of his hand and also denied ever saying that she did.

four hours before the scan was performed. He agreed that Adriana had suffered severe skull fractures, that they were caused by slamming the back of her head against something solid, that she probably lost consciousness immediately after the blows were struck, and that she might have become incapacitated, but believed there was a good chance that she subsequently regained some functions. Although the baby would not have been able to crawl, sit up, or eat after her injuries, she might have been able to swallow in an uncoordinated way, make sounds that resembled crying, and make involuntary bicycling motions that could enable her to move along the floor. He conceded, though, that she would have remained unconscious had she passed out a second time.

Dr. Imbus had never treated Adriana and relied instead on the CT scan and portions of Dr. Ribe's and Dr. Lowder's testimony. He had not reviewed the autopsy report. The pediatric neurologist also opined that petitioner could not have had the full mobility of his left shoulder on November 18, although his stitches had been removed several days earlier, and that petitioner therefore lacked the capacity to inflict the injuries on the side of Adriana's head, although he could have inflicted the injuries on the back of her head.

### Petition for Writ of Habeas Corpus

Petitioner was convicted by a jury of second degree murder (Pen. Code, § 187) and assault on a child causing death (Pen. Code, § 273ab) and sentenced to a term of 15 years to life. While his appeal was pending, he filed a petition for writ of habeas corpus, alleging that the Los Angeles County District Attorney withheld (and continued to withhold) potentially exculpatory evidence from him and his attorney in violation of *Brady* and that his attorney's performance was so deficient as to deprive him of his Sixth Amendment right to counsel under *Strickland v. Washington* (1984) 466 U.S. 668 [80 L.Ed.2d 674, 104 S.Ct. 2052].

The *Brady* claim asserted that the People had failed to disclose certain impeachment material regarding Dr. James Ribe. The alleged impeachment consisted of "changes of opinion and changes in testimony given by Dr. Ribe in several [other] cases," including *People v. Wingfield* (Super. Ct. L.A. County, No. LA020636) (*Wingfield*). The Court of Appeal issued an order to show cause as to the *Brady* claim and remanded the matter to the superior court for an evidentiary hearing. The purpose of the hearing was threefold: (1) "to ensure that the District Attorney has turned over all relevant *Brady* material and to issue any necessary orders compelling compliance with valid discovery requests"; (2) to determine "when, in connection with the facts of this case, the prosecution knew or should have known the information relating to Dr. Ribe was material to petitioner's defense"; and (3) to

make "any other findings relevant to determination of whether a *Brady* violation occurred and may have been prejudicial to petitioner's case."

On May 21, 2002, the referee, Judge Michael Harwin, issued his report. The referee found that petitioner had received all requested discovery "with the possible exception of: a) A definitive list of all Ribe cases where timelines were relevant; b) Personal notes of Dr. Ribe, not already disclosed and supplied, re: timeline cases with children on which he conducted the autopsy and/or later modified an opinion; [and] c) . . . [A] complete [Ribe] box . . . [of] case transcripts [that counsel had already 'been allowed to "look at" ' and that] she should then be allowed to compare the contents thereof to another 'Ribe box' maintained at a branch office of the District Attorney." The referee further found that the prosecutor's "concerns" about Dr. Ribe's testimony "arose at least by September 26, 1996," when police investigators met with the district attorney's office to discuss whether Eve Wingfield was errone- ously in custody for the death of two-year-old Lance Helms, and that "supervisory and administrative personnel [in the district attorney's office] were on 'Ribe notice' at the time of the *Salazar* trial. . . . Regardless of any belief by a District Attorney supervisor that such Ribe testimony was a 'legitimate change of opinion,' instead of '*Brady* material,' its affect [*sic*] was of such a magnitude that in a case where a timeline was crucial as to which of several people had custody of a child at the time of injury, such a change of opinion would have to be perceived as potential impeachment on cross examination. Especially in a case so similar to Helms—a child victim, head injuries, timeline of potential perpetrators—and where the testifying coroner was the same. Had this Court been informed of the prior changes of opinion, it would have ordered additional disclosure if requested and allowed further defense inquiry on cross examination. Moreover, knowledge of the change of opinion would likely have led any defense counsel to have known to ask for more specific information, as opposed to a general, informal discovery letter on other Ribe cases. Such discovery might have shown such a pattern as has resulted in the so called 'Ribe box' of discovery, or additional, other, expert testimony."

The Court of Appeal, in a published opinion, concluded that a *Brady* violation occurred. The opinion reviewed Dr. Ribe's testimony in other cases but focused special attention on *Wingfield*. As recounted by the Court of Appeal, Dr. Ribe originally testified that Lance Helms died within 30 to 60 minutes after he was injured. Wingfield, who had been with Lance during that period, was charged with his murder and entered a plea of no contest to a charge of manslaughter. Dr. Ribe subsequently changed his mind about the causal facts and circumstances leading to Lance's death, and the district attorney's office reopened the matter. The Court of Appeal concluded that Ribe's testimony in *Wingfield* had been "inconsistent"; that there was a "connection" between *Wingfield* and this case; that the connection could have

been used to impeach Dr. Ribe's testimony in this case; and that the district attorney had failed to disclose the impeaching evidence to the defense. The Court of Appeal further reasoned "that while there is sufficient evidence in the record to affirm the conviction, we cannot be confident in the jury's verdict because of the *Brady* violation" and therefore granted relief.

We granted the Attorney General's petition for review.

### STANDARD OF REVIEW

■ We have not previously addressed the standard of review applicable to *Brady* claims. (See *In re Pratt* (1999) 69 Cal.App.4th 1294, 1314 [82 Cal.Rptr.2d 260].) Conclusions of law or of mixed questions of law and fact, such as the elements of a *Brady* claim (*DiLosa v. Cain* (5th Cir. 2002) 279 F.3d 259, 262, fn. 2), are subject to independent review. (*In re Lucas* (2004) 33 Cal.4th 682, 694 [16 Cal.Rptr.3d 331, 94 P.3d 477].) Because the referee can observe the demeanor of the witnesses and their manner of testifying, findings of fact, though not binding, are entitled to great weight when supported by substantial evidence. (*Ibid.*)

### DISCUSSION

■ In *Brady*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady, supra,* 373 U.S. at p. 87.) The high court has since held that the duty to disclose such evidence exists even though there has been no request by the accused (*United States v. Agurs* (1976) 427 U.S. 97, 107 [49 L.Ed.2d 342, 96 S.Ct. 2392]), that the duty encompasses impeachment evidence as well as exculpatory evidence (*United States v. Bagley* (1985) 473 U.S. 667, 676 [87 L.Ed.2d 481, 105 S.Ct. 3375]), and that the duty extends even to evidence known only to police investigators and not to the prosecutor (*Kyles v. Whitley* (1995) 514 U.S. 419, 438 [131 L.Ed.2d 490, 115 S.Ct. 1555]). Such evidence is material " 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " (*Id.* at p. 433.) In order to comply with *Brady*, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." (*Kyles, supra,* 514 U.S. at p. 437; accord, *In re Brown* (1998) 17 Cal.4th 873, 879 [72 Cal.Rptr.2d 698, 952 P.2d 715].)

■ "[T]he term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to

any suppression of so-called '*Brady* material'—although, strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." (*Strickler v. Greene* (1999) 527 U.S. 263, 281–282 [144 L.Ed.2d 286, 119 S.Ct. 1936], fn. omitted.) Prejudice, in this context, focuses on "the materiality of the evidence to the issue of guilt or innocence." (*United States v. Agurs, supra,* 427 U.S. at p. 112, fn. 20; accord, *U.S. v. Fallon* (7th Cir. 2003) 348 F.3d 248, 252.) Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible (cf. *Wood v. Bartholomew* (1995) 516 U.S. 1, 2 [133 L.Ed.2d 1, 116 S.Ct. 7]), that the absence of the suppressed evidence made conviction "more likely" (*Strickler, supra,* 527 U.S. at p. 289), or that using the suppressed evidence to discredit a witness's testimony "might have changed the outcome of the trial" (*ibid.*). A defendant instead "must show a 'reasonable probability of a different result.' " (*Banks v. Dretke* (2004) 540 U.S. 668, 699 [157 L.Ed.2d 1166, 124 S.Ct. 1256].)

Petitioner's claim of *Brady* error in this court rests entirely on the prosecution's alleged suppression of the November 15, 1996, follow-up investigation report into the murder of two-year-old Lance Helms. According to petitioner, this report reveals that Dr. Ribe changed his opinion concerning the timeline in the Helms investigation and that Dr. Ribe's new opinion was based on nonmedical information and thus intended solely to fit the prosecution's new theory of the case. Petitioner then argues that the defense could have used Dr. Ribe's "flip-flop" in *Wingfield* to impeach his testimony concerning the timeline in this case, that the prosecution improperly withheld the follow-up investigation report from the defense, and that this report was "material" to the issue of petitioner's guilt within the meaning of *Brady*. After reviewing the record and the applicable law, we find that petitioner has failed to establish true *Brady* error.

A. *Information Concerning the Murder of Lance Helms and the November 15, 1996, Follow-up Investigation Report of the Murder*

On April 6, 1995, two-and-one-half-year-old Lance Helms died as a result of massive internal injuries and abdominal bleeding caused by severe blunt force trauma. His death sparked statewide criticism of the dependency court system and the child welfare laws that determine whether children at risk become wards of the court or are returned to their parents. (See Lewis, *Chapter 417: The Welfare of Children—A Higher Priority Than Family*

*Reunification* (2000) 31 McGeorge L.Rev. 561, 561–562.) The present case, however, does not involve the public outcry over the tragedy and the subsequent changes to the dependency system but only the manner in which Lance's murder was investigated and charged.

When Lance died, suspicion immediately focused on the boy's father, David Helms, and David's girlfriend, Eve Wingfield. Lance, who had been home with flu symptoms, was in Wingfield's care all day until David came home in the evening. At that point, David asked Wingfield to redeem a ring she had earlier pawned for him. Wingfield left Lance with David while she went to the pawn shop. When she returned, David told her something was "wrong" with Lance. She saw that his lips were blue, water was coming out of his mouth, his body was limp, and he did not appear to be breathing. David called 911, but Lance could not be revived.

Dr. Ribe supervised Lance's autopsy, which revealed massive abdominal bleeding from multiple fist blows to the abdomen. At the autopsy, Dr. Ribe told police that Lance's death was "very rapid, minutes to one hour" after the injuries were inflicted and indicated on the death certificate that death was "rapid." Less than two weeks later, when the district attorney's office asked for a time estimate, Dr. Ribe reiterated that the injuries were "rapidly fatal-minutes to two hours maximum."

At the preliminary hearing in the prosecution of Eve Wingfield, Dr. Ribe testified that the injuries were so extensive, "death could have supervened very quickly, in a matter of just a few minutes from these injuries." Because the injuries were "not survivable for any extended period of time" and Lance therefore could not have survived "for greater than about one hour maximum time," Dr. Ribe estimated that the injuries must have been inflicted "from minutes out to a maximum of about one hour" prior to death. The wounds were very fresh and could have been inflicted only 30 to 60 minutes before Lance died. Dr. Ribe sometimes extended the longer end of this period, such that the injuries could have been inflicted "within a matter of minutes to a very few hours prior to physiologic death" and noted that he had in the past told police that it could have been anywhere from minutes up to four hours. Dr. Ribe explained the differing estimates by pointing out that "exactitude was not possible." Dr. Ribe also testified that it was possible Lance had remained alert enough to ask for water and to attempt to drink it even after being injured.

A combination of several factors led police to focus their suspicions, erroneously, on Eve Wingfield rather than on David Helms. First, Wingfield misled police as to the length of time she was absent from the apartment. She told police she had left Lance alone with David for only 10 minutes, rather

than the 15 to 25 minutes she was actually away, because she was afraid of David, who had regularly abused her. Wingfield was also unaware of Lance's fatal injuries and assumed Lance's death had somehow been connected to his stomach flu; therefore, she thought she needed to protect David from police suspicion. Consequently, she minimized the time David was alone with Lance and falsely denied that David had abused her.[4] Second, Wingfield failed a polygraph examination but, unknown to police, the test was unreliable because Wingfield was pregnant. Third, as the follow-up investigation revealed, the original police investigation was conducted in an incompetent manner. Fourth, although David and Wingfield were both suspects, Wingfield had less of an alibi during the timeline Dr. Ribe had identified.

After the preliminary hearing, Wingfield's attorney advised her that he believed the prosecution had a strong case against her; that, if she went to trial, the jury would convict her at least of child endangerment (if not murder) and that she would receive a life sentence; and that she would be better off taking a deal for a 10-year sentence, of which she would serve less than five years. Despite the various timelines Dr. Ribe had discussed at the preliminary hearing, Wingfield's attorney apparently focused only on the estimate that Lance had died 30 to 60 minutes after the assault and could have remained alert enough to speak and drink water after the assault. On advice of counsel, Wingfield therefore entered a plea of no contest to manslaughter and was sentenced accordingly.

In 1996, Wingfield expressed a desire to withdraw her plea. Her request was supported by David's mother, Gail Helms, who had filed a citizen's complaint against the original investigating police officer and had insisted from the beginning of the investigation that David was responsible for Lance's death. Los Angeles Police Department Detectives Stephen Bernard and Terry Lopez reviewed the "murder book," including the photographs, and discovered that Lance's liver had suffered extreme lacerations. Based on their experience with gunshot wounds to that organ, both detectives suspected that death was even "more immediate" than Dr. Ribe's timeline had described. The detectives met with a highly experienced child abuse pathologist, Dr. Eva Heuser, who agreed that Lance's death was more rapid than Dr. Ribe had stated. As part of the follow-up investigation, Lopez reinterviewed Wingfield, who provided a different chronology of events on the day of the murder, admitted that David had abused her in the past, and described the threats she had received from David's family.

---

[4] David warned Wingfield at the hospital that the police would try to blame one of them for Lance's death and said they needed to stick together. Later, David's brother threatened to kill Wingfield if she did not accept responsibility for the child's death.

Detective Lopez met with Dr. Ribe on October 11, 1996, in order to review the autopsy findings and each of Lance's injuries. Dr. Ribe stated that Lance's liver had been split in half by a blow using "tremendous force," which "likely caused instant incapacitation, and rapid death"; that another "tremendous" blow to the liver and diaphragm probably caused instantaneous respiratory arrest, which he had failed to appreciate during his initial review; that the tear of the mesenteric root, caused by a blow to the lower abdomen with "maximum force," caused instant or rapid incapacitation leading to death within a few minutes to one-half hour; that another blow with maximum force resulted in a tear in the small bowel jejunal mesentery, causing rapid death within minutes of the assault; that a tight chest squeeze or abdominal blows had caused hemorrhages in the lungs and heart, possibly resulting in instantaneous cardiac arrest; and that the blood loss from all these injuries could have resulted in death within four to six minutes.[5]

Dr. Ribe told the detectives that Lance had died within a few minutes of the assault and that his opinion at the autopsy was therefore unchanged. While the "short end" of his estimate at the preliminary hearing remained unchanged, he had come to believe the "long end" (i.e., that Lance could have survived for one to two hours or more) was highly unlikely, based on his consultations with the chief medical examiner, Dr. Lakshmanan Sathyavagiswaran, and two outside experts. Dr. Ribe also cautioned that, at the preliminary hearing, he had failed to recognize that Lance had been *instantly* incapacitated from these injuries and therefore admitted that he gave the "wrong" answer when he said that Lance could have remained alert "almost up to the very end" and could possibly have asked for water. His change of opinion concerning Lance's consciousness after the assault was based on a more thorough examination of the liver, diaphragm, and heart injuries.

In an interview two weeks later, Dr. Sathyavagiswaran opined that Lance's blood loss would have resulted in shock and unconsciousness within a few minutes and that death could have followed within 30 minutes of the assault.

Based on the follow-up investigation, which indicated that Lance's injuries were instantly incapacitating and that Lance had been in David's custody immediately prior to his death, the police requested that murder charges be filed against David Helms. The People advised Wingfield's attorney of the findings of the follow-up investigation.

On September 12, 1997, Wingfield was allowed to withdraw her plea. On May 15, 1998, Wingfield pleaded no contest to one count of child endangerment in violation of Penal Code section 273a, subdivision (a) and was placed

---

[5] Prior to this interview, Dr. Ribe had consulted with Dr. Heuser as to how quickly a two-year-old child would die from massive liver injuries inflicted in an assault. Dr. Heuser stated that death would come "very quickly, minutes."

on probation. When probation terminated, the case was dismissed under Penal Code section 1203.4. David Helms was subsequently convicted of Lance's murder.

### B. *Petitioner's Discovery of Dr. Ribe's Involvement in the Helms Murder Investigation*

On September 11, 1997, while Dr. Ribe was testifying at petitioner's trial, the Los Angeles Times published a story about the follow-up investigation into Lance Helms's murder and the effort to exonerate Eve Wingfield. The article stated that Dr. Ribe had "changed his conclusion" and now believed that the fatal injuries were " 'instantly incapacitating' " and quoted Wingfield's attorney as saying that the original investigation was " 'flawed' " in that " '[w]hen the medical examiner made his initial conclusion, he did so without a complete picture.' " (Blankstein, *Report Raises Questions in Child—Abuse Conviction*, L.A. Times (Sept. 11, 1997) p. B1.) Based on the article, petitioner's attorney requested an Evidence Code section 402 hearing. Dr. Ribe stated that he was familiar with the newspaper article but, in response to a question whether he had changed his opinion regarding the time of death, asked to see his original testimony in order to refresh his recollection. Neither the prosecution nor the defense had that testimony immediately available. When the court offered defense counsel the opportunity to ask any other questions of Dr. Ribe, counsel said he would await the transcript of the preliminary hearing and the coroner's file. The district attorney offered to obtain the transcript, and the court ordered production of the coroner's file.

Later that day, while Dr. Ribe was still testifying, the prosecutor provided the defense with a copy of Dr. Ribe's preliminary hearing testimony in *Wingfield.* The defense did not request a continuance. (See *United States v. Grintjes* (7th Cir. 2001) 237 F.3d 876, 880.) At the end of his testimony, Dr. Ribe was excused, subject to recall. Defense counsel never recalled the witness, nor did he cross-examine Dr. Ribe about his opinions in the Helms murder investigation.

### C. *Petitioner's* Brady *Claim*

Petitioner claims that the prosecution violated *Brady* by failing to provide him with a copy of the November 15, 1996, follow-up investigation report of the Helms murder. We must therefore consider whether petitioner has established each element of a *Brady* claim.

#### 1. *Was the follow-up investigation report favorable to petitioner?*

The first element of a *Brady* claim is that the evidence be favorable to the accused. (*Strickler v. Greene, supra,* 527 U.S. at pp. 281–282.) In

petitioner's view, evidence that Dr. Ribe altered his opinion as to the timing of Lance Helms's incapacitation and death was favorable to him in that it could have been used to impeach Dr. Ribe's testimony concerning the timeline in this case. The impeaching value of this evidence, according to petitioner, does not depend on a finding that Dr. Ribe's earlier testimony was inconsistent with his testimony here. Nor does it rest on a theory that the change in Dr. Ribe's testimony suggested he is incompetent. Petitioner contends instead that Dr. Ribe's performance in *Wingfield* showed that he is *biased*. He reasons that Dr. Ribe "relied on arguably inappropriate non-medical 'facts' when he changed his opinion. . . . [I]f a pathologist relies on non-medical facts as a foundation for his medical opinion, and especially if he relies on such facts contrary to accepted practice, he is subject to impeachment. . . . [¶] The fact is that Dr. Ribe takes non-medical information and then shifts his opinion to accommodate those facts."

The Attorney General disagrees that Dr. Ribe relied on nonmedical facts in revising his opinion, pointing out that Dr. Ribe had failed to appreciate the possibility of respiratory arrest in forming his original opinion and had subsequently consulted with outside experts. The Attorney General contends further that a change of opinion based on further research or new facts "is not 'impeaching' information" and that, in any event, petitioner has not shown that Dr. Ribe's revised opinion was wrong.

■ It is well settled that the prosecution's *Brady* obligation to disclose material evidence favorable to the defense encompasses impeachment evidence. (*City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 8 [124 Cal.Rptr.2d 202, 52 P.3d 129].) The Attorney General does not argue that the follow-up investigation report was *unfavorable* to petitioner. He contends instead that the report is not impeaching because Dr. Ribe had a legitimate basis for changing his opinion in that earlier case. But this objection goes to the weight, not the character of the evidence as impeaching—or, in *Brady* terms, the Attorney General is really disputing whether the evidence is *material*, not whether it is *favorable*. We therefore find that petitioner has established the first element of a *Brady* claim.

### 2. *Was the follow-up investigation report suppressed?*

■ The second element of a *Brady* claim is that the evidence must have been "suppressed" by the government. (*Strickler v. Greene, supra*, 527 U.S. at p. 282; *Banks v. Dretke, supra*, 540 U.S. at p. 691.) Although the prosecution may not withhold favorable and material evidence from the

defense, neither does it have the duty to conduct the defendant's investigation for him. (*People v. Morrison* (2004) 34 Cal.4th 698, 715 [21 Cal.Rptr.3d 682, 101 P.3d 568].) If the material evidence is in a defendant's possession or is available to a defendant through the exercise of due diligence, then, at least as far as evidence is concerned, the defendant has all that is necessary to ensure a fair trial, even if the prosecution is not the source of the evidence. (*Coe v. Bell* (6th Cir. 1998) 161 F.3d 320, 344; *U.S. v. Pandozzi* (1st Cir. 1989) 878 F.2d 1526, 1529–1530.) Accordingly, evidence is not suppressed unless the defendant was actually unaware of it and could not have discovered it " 'by the exercise of reasonable diligence.' " (*People v. Morrison, supra,* 34 Cal.4th at p. 715; see generally *Strickler v. Greene, supra,* 527 U.S. at p. 282 [the inquiry whether cause exists to excuse a procedural default parallels the inquiry whether the government suppressed evidence]; *Banks v. Dretke, supra,* 540 U.S. at p. 691 [same].)

Petitioner asserts categorically that "[t]rial counsel could not possibly have had knowledge of that reinvestigation report unless the prosecutor obtained it from police and gave it to him." The Attorney General responds that newspaper articles concerning Dr. Ribe's credibility appeared well before trial, that defense counsel therefore had a basis for inquiring into Dr. Ribe's performance in previous cases, and that defense counsel, with reasonable diligence, could have obtained the follow-up investigation report himself. As interesting as this debate may be, we find it unnecessary to remand the matter to the Court of Appeal to determine whether the follow-up investigation report was suppressed entirely or, alternatively, whether information that could have led to its discovery was disclosed too late for petitioner to make meaningful use of it because (as explained in the next part) we find that the follow-up investigation report was not material. (See *U.S. v. Gonzalez* (2d Cir. 1997) 110 F.3d 936, 944.)[6]

### 3. *Was the follow-up investigation report material?*

█ The third element of a *Brady* claim is that the suppressed evidence be material, "for not every nondisclosure of favorable evidence denies due process." (*In re Brown, supra,* 17 Cal.4th at p. 884.) "[T]he prosecution has no *general duty* to seek out, obtain, and disclose all evidence that might be beneficial to the defense" (*In re Littlefield* (1993) 5 Cal.4th 122, 135 [19

---

[6] For the same reason, we need not address the argument of amicus curiae California Public Defenders Association that, under *Banks v. Dretke, supra,* 540 U.S. 668, the People have a duty to disclose material evidence even when the defense could reasonably obtain the evidence through independent means.

Cal.Rptr.2d 248, 851 P.2d 42]), since "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." (*Kyles v. Whitley*, *supra*, 514 U.S. at pp. 436–437.) Rather, a violation occurs " 'only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different.' [Citations.] The requisite 'reasonable probability' is a probability sufficient to 'undermine[] confidence in the outcome' on the part of the reviewing court." (*In re Sassounian* (1995) 9 Cal.4th 535, 544 [37 Cal.Rptr.2d 446, 887 P.2d 527].)

 "In general, impeachment evidence has been found to be material where the witness at issue 'supplied the only evidence linking the defendant(s) to the crime,' *United States v. Petrillo*, 821 F.2d 85, 90 (2d Cir. 1987); *see also Giglio v. United States*, 405 U.S. [150,] 154–55 [31 L.Ed.2d 104, 92 S.Ct. [763,] 766] [(1972)] (*Brady* violation found where government failed to disclose promise not to prosecute cooperating witness on whom government's case against defendant 'almost entirely' depended), or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case, *see United States v. Badalamente*, 507 F.2d 12, 17–18 (2d Cir. 1974) (same re nondisclosure of 'hysterical' letters that would have had 'powerful adverse effect' on witness's credibility, where that credibility was 'crucial to the determination of [the defendant's] guilt or innocence'); *cert. denied*, 421 U.S. 911 [43 L.Ed.2d 776, 95 S.Ct. 1565 (1975)]. In contrast, a new trial is generally not required when the testimony of the witness is 'corroborated by other testimony,' *United States v. Petrillo*, 821 F.2d at 89 . . . ; [citation]; *see also Giglio v. United States*, 405 U.S. at 154 [92 S.Ct. at 766] (new trial not required where newly discovered evidence is merely 'possibly useful to the defense but not likely to have changed the verdict')." (*U.S. v. Payne* (2d Cir. 1995) 63 F.3d 1200, 1210.)

Petitioner asserts that "[w]ithout [Dr. Ribe's] testimony, the prosecution could not effectively connect [him] with the time frame in which the baby suffered the injuries that resulted in her death," but this claim is belied by the record. Dr. Ribe's testimony was not the only evidence linking petitioner to the crime, since his opinion that the death was nonaccidental was corroborated by Dr. Gilbert Mellin, the radiologist; by Dr. Dorothy Calvin, the pediatric ophthalmologist; and by Dr. Harold Lowder, who treated Adriana when she arrived at the emergency room. Dr. Ribe's opinion concerning the timing of the injuries was corroborated by Dr. Lowder, who testified that Adriana's symptoms, including loss of consciousness, would have appeared

immediately. Indeed, the People could have obtained the same testimony from additional witnesses—including the chief medical examiner, Dr. Sathyavagiswaran—who could not have been impeached by the Helms investigation.

Petitioner's guilt was also established by his inconsistent accounts of what happened during the period he was alone with Adriana. He gave conflicting reports as to when Adriana started vomiting; whether Adriana knocked the spoon out of his hands and spit or threw food at him; whether he lifted her up, tossed her in the air, or shook her before she vomited; and whether she was "fine" before he started feeding her. These inconsistencies substantially undermined petitioner's attempt to shift the blame to others. (See *People v. Mincey* (1992) 2 Cal.4th 408, 450 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

Petitioner's guilt was additionally supported by the inconsistency between his account of what occurred and the injuries Adriana had suffered. Indeed, it seems quite improbable that petitioner could have picked the infant up from her bed, stroked her head, and brought her up to eye level to "check[]" her a few times without noticing that her skull had been fractured and the back of her head was "very boggy." It is equally improbable that petitioner noticed the condition of Adriana's head but innocently forgot to mention it to the 911 operator, especially since petitioner informed the 911 operator that Adriana had been "fine" until she started to have trouble breathing. Accordingly, even successful impeachment of Dr. Ribe's testimony would not have materially affected the jury's assessment of petitioner's guilt.

Finally, it is unlikely the follow-up investigation report in the Helms murder would even have been viewed as significant impeachment evidence in petitioner's case. Petitioner's theory that Dr. Ribe shapes his testimony to fit the prosecution's case is neither the inevitable nor the most logical inference from the follow-up investigation report. As Dr. Ribe explained, his opinion concerning the Helms murder, in the main, remained consistent throughout. He merely shortened the long end of his estimate of the time of injury and loss of consciousness based on consultations with outside experts and closer examination of the injuries Lance had suffered—but neither of these factors indicates that Dr. Ribe was biased nor that Dr. Ribe's modification to his earlier opinion was inaccurate or unjustified. Although Dr. Ribe considered David Helms's history of abusive behavior in assessing "whether the medical evidence tended to correlate or not correlate with that type of information" and (thus) whether his original opinion warranted a reexamination, Dr. Ribe did not *rely* on those facts in revising his opinion. Petitioner's attempt to focus the blame for the prosecution of Eve Wingfield entirely on Dr. Ribe also ignores the time estimates Dr. Ribe provided to police and the district attorney as well as at the preliminary hearing that implicated David Helms;

the misleading and incomplete version of events provided by Eve Wingfield; and the incompetent investigation undertaken by the original investigating officer.[7]

In sum, the evidence does not strongly support—if at all—petitioner's claim that Dr. Ribe was a mere puppet of the prosecution and thus should have been disbelieved in this case.[8] Moreover, even if petitioner could have succeeded in impeaching Dr. Ribe, equivalent testimony was supplied by other witnesses and could have been supplied by still others. In light of that testimony, as well as other circumstantial evidence of petitioner's guilt, it is not reasonably probable the result would have been different had the defense sought to use the Helms murder investigation to impeach Dr. Ribe's testimony. (See *Strickler v. Greene, supra,* 527 U.S. at pp. 294, 296.)[9] We therefore conclude that petitioner has failed to establish the materiality of this evidence under *Brady.*

---

[7] Petitioner chose in this court to focus his claim of error exclusively on Dr. Ribe's conduct relating to the Helms murder and asserted, without any elaboration or explanation, that "other" instances of Dr. Ribe's conduct merely "exacerbated" this "initial" *Brady* violation. The latter argument is improperly presented, and we reject it on that basis. (*People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19 [32 Cal.Rptr.2d 762, 878 P.2d 521].) We have also reviewed the pleadings and the entire record below and find that none of the other cases, singly or in combination, present an issue of materiality.

[8] In support of his claim that the evidence is material, petitioner initially relied heavily on the fact that the Los Angeles County District Attorney's Office had assembled boxes of materials concerning Dr. Ribe's testimony in *Wingfield* and in other cases and had directed deputy district attorneys to make this information available to defense counsel in cases where Dr. Ribe was expected to testify. Although there seems to have been a lively debate within the office as to whether these Ribe boxes were assembled "out of an abundance of caution" or because of a belief the information *had* to be produced to the defense, this court need not defer to a prosecutor's opinion that information already identified is or is not *Brady* material. (See *People v. Seaton* (2001) 26 Cal.4th 598, 649 [110 Cal.Rptr.2d 441, 28 P.3d 175].) Whether, in this case, the district attorney followed his stated policy of resolving doubtful questions in favor of disclosure is not for us to say, since the due process clause "does not tax the prosecutor with error for any failure to disclose, absent a further showing of materiality." (*Kyles v. Whitley, supra,* 514 U.S. at p. 439.) Moreover, since "the determination of materiality for *Brady* purposes is necessarily fact specific" (*State v. Bright* (La. 2004) 875 So.2d 37, 44, fn. 7), it is rarely possible to predetermine whether particular information in any individual case will be material. We therefore accept petitioner's subsequent concession that "[t]he Ribe discovery box has nothing to do with whether or not there was a *Brady* violation at trial."

[9] The Court of Appeal reasoned that Dr. Ribe's performance in the Helms murder investigation could have "cast doubt on the entire manner in which [petitioner's] case was investigated," in that "the investigating detectives immediately focused on petitioner as the perpetrator to the exclusion of any others," based on Dr. Ribe's timeline. The premise of the Court of Appeal's analysis, however, is flawed. The police arrested petitioner on November 18, 1996—before Dr. Ribe even became involved—based on Dr. Lowder's skepticism of petitioner's account of what had occurred, Dr. Lowder's estimated time of injury, and petitioner's inconsistent statements. Moreover, any suggestion that the police, by using different investigative methods, could have uncovered evidence pointing to another suspect is pure speculation. (*Wood v. Bartholomew, supra,* 516 U.S. at pp. 6–7.)

## DISPOSITION

The judgment of the Court of Appeal is reversed and the cause remanded for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied August 10, 2005. Werdegar, J., did not participate therein.