Filed 7/5/24  In re Jenkins on Habeas Corpus CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re JASMINE JENKINS<br><br>    on Habeas Corpus. | B301638<br><br>(Los Angeles County<br>Super. Ct. No. BA467828) |

        Habeas proceedings after a judgment of the Superior Court of Los Angeles County, Lisa B. Lench, Judge.  Petition denied.

        Rudolph J. Alejo, under appointment by the Court of Appeal, for Petitioner.

        Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Seth K. Schalit and Amit Kurlekar, Deputy Attorneys General, for Respondent.

                        _____

After her conviction for manslaughter in 2018, Jasmine Jenkins petitioned for a writ of habeas corpus on the ground that the prosecution violated *Brady v. Maryland* (1963) 373 U.S. 83 by failing to disclose that the victim and her sister, a main prosecution witness, had been adjudicated responsible as juveniles for aggravated assault against three people in 2006. We issued an order to show cause (OSC) on the issue but concluded that even if the prosecution failed to disclose exculpatory evidence, it is not reasonably probable the evidence was material. Accordingly, we denied the petition and discharged the OSC. (*People v. Jenkins* (Jan. 22, 2021, B294747, B301638) [nonpub. opn.].)

Our Supreme Court granted review on the sole issue of whether the prosecution had disclosure obligations related to petitioner's *Brady* claim. The high court held that the prosecution does have such obligations and remanded with directions to discharge those obligations. The Court did not address our materiality holding, instead directing us to reevaluate the materiality of undisclosed evidence in light of the entire record. (*In re Jenkins* (2023) 14 Cal.5th 493.)

Respondent complied with his discovery obligations on remand, and Jenkins reaffirmed her original petition, arguing that undisclosed evidence of prior violent assaults committed by both the victim and the main prosecution witness materially affected the trial, rendering the trial unfair and the verdict unworthy of confidence.

We have reexamined the record as a whole in light of the new evidence that Jenkins and the main prosecution witness committed three violent assaults in 2006. We conclude the

prosecution's failure to disclose the evidence did not undermine the verdict.  Accordingly, we deny habeas relief.

BACKGROUND

## I.    Trial

In the evening of January 19, 2018, Brittneeh Williams drove to Jenkins's apartment with her young daughter to allow the daughter to visit her father, Kayuan Mitchell, Jenkins's current boyfriend.  At the apartment, Williams and Mitchell got into a fight that resulted in Mitchell beating Williams and causing her to bleed from her forehead.

Jenkins arrived in her car, with her young son by Mitchell in the backseat, and taunted Williams.  Mitchell got into Jenkins's car and they drove away but Williams, who had by now called her sister, Sade Williams, gave chase, sometimes driving erratically.

Mitchell instructed Jenkins to pull into a gas station, where Williams followed.  Williams left her car, approached Jenkins's car, and shouted at Jenkins and possibly punched her through the open window.  Mitchell exited Jenkins's car and tried to restrain Williams but had difficulty doing so, in part because Jenkins taunted Williams from her car.

Sade Williams arrived, and after back-and-forth scuffles between Mitchell and Williams, Jenkins exited her car with a large kitchen knife and stabbed Williams, killing her.

Jenkins was charged with murder.  (Pen. Code, § 187).[1]

### A.    Prosecution Evidence

At trial, Ajay Panchal, a deputy medical examiner for the Los Angeles County Coroner, testified that Williams suffered

---

[1] Unspecified statutory references are to the Penal Code.

3

three stab wounds to her chest and abdomen, any of which would have been fatal. Panchal opined that a person suffering these injuries could still stand up and run for a very short period of time.

The prosecution presented security camera video recordings depicting the fight. They revealed that the skirmish outside Jenkins's car between Williams on one side and Jenkins and Mitchell on the other lasted about a minute and involved three discrete encounters between Jenkins and Williams, the first two occurring at the gas pumps and the last at a bus stop on the sidewalk. The footage is of poor quality making it difficult to identify either the individuals or their acute actions without an accompanying narrative, but it appears to depict the following: Mitchell threw Williams violently to the ground; Williams popped up and charged Jenkins and attacked her, but was driven off and held by Mitchell at the bus stop; Jenkins approached the pair at the bus stop, and while Mitchell restrained Williams, attacked her. The poor quality and limited coverage of the videos makes it impossible to see when Williams was actually stabbed.

Sade Williams testified that Jenkins walked up to Williams and stabbed her while Mitchell held her in a bear hug. Sade yelled either, "You stabbed my sister," or "She stabbed my sister." Jenkins walked back toward her car and said, smirking and smiling, "No I didn't," or "Ha, I didn't do anything. I didn't do nothin'." Sade saw that Jenkins held an approximately 10-inch-long knife, which she swung at Sade. Mitchell pushed Williams back toward a nearby bus stop, where she fell to the ground, then he and Jenkins drove away.

Sade testified that Williams was a non-violent person and was not a bully. Trial counsel declared Sade was particularly emotional during this portion of her testimony.

A.V., a 10-year-old who was with her mother at the bus stop, testified that Jenkins followed Williams to the bus stop, took a six-inch knife from her back pocket, said, "This is gonna be real scary," and stabbed Williams. A.V. testified that Jenkins was smiling and angry, "like a psychopath."

### B. Defense Evidence

For the defense, Jenkins testified about three previous incidents in which Williams attacked her: During her son's birthday party in 2015; two months later; and in 2016, after which Jenkins called the police and Williams was arrested. As a result of this fight, Williams was ordered to attend anger management classes.

Jenkins testified that while she sat in her car outside her apartment on January 19, 2018, Williams approached, looking angry. Jenkins locked the car doors but Williams tried to open one and began hitting a window, telling Jenkins, "Bitch, get out the car." Mitchell distracted Williams for a moment, got in the car and told Jenkins to drive away. As he was getting in, Williams ran up to the car and beat on the car window as they drove away.

As they drove, Jenkins saw Williams follow them in her car and swerve into another lane to try and drive parallel to her. Both cars sped up for a distance, and Jenkins eventually pulled into a gas station. Mitchell got out of the car and yelled at Williams about driving recklessly when children were in both cars. Jenkins taunted Williams, and Williams got out of her car and ran to Jenkins's window and punched her. Mitchell pulled

Williams back, causing her to fall to the ground. Thinking Williams was going to attack her in her car with her son watching, Jenkins took a green kitchen knife from a pocket in the driver's side door and exited the car.

Jenkins testified that she walked toward Williams as Mitchell pushed her toward the bus stop and asked her why she was so mad. Williams responded by "jumping up and down like, 'you're a buster. You're scared. You're scared. You're a buster.'" Jenkins backed up as Sade Williams ran to her sister and told Mitchell to also back away.

When Mitchell let Williams go, she charged Jenkins and started hitting her. Jenkins retreated and waved her knife at Williams but fell backward, and Williams fell on top of her. Jenkins testified variously that she stabbed Williams only once, stabbed her three times, and had no idea that she had stabbed her. Mitchell and Sade lifted Williams off Jenkins, and Mitchell got back in the car and they left.

Breyan Sims, Jenkins's friend, testified about a previous incident in which Jenkins and Williams got into a physical altercation at Jenkins's son's birthday party. When Jenkins asked Williams to leave, Williams punched her in the face, and they fought until Mitchell pulled Williams off Jenkins. Williams's friends arrived at the party later and threatened to beat up Jenkins.

### C.  Argument

The prosecution argued Jenkins stabbed Williams during the first and possibly third encounters at the gas station, when Williams first approached Jenkins and when Mitchell pushed her to the bus stop, but not the second, when Williams fell on top of Jenkins.

The defense theorized that Jenkins stabbed Williams only during the second encounter, doing so to lawfully defend herself against Williams's attack.

### D.    Verdict

The jury was instructed on murder, on the full justification theory of self-defense, and on the lesser included offenses of voluntary and involuntary manslaughter.  With respect to voluntary manslaughter, the jury received instructions on both heat of passion and imperfect self-defense.

The jury deliberated for nine and a half hours and requested a readback of Sade's testimony before acquitting Jenkins of murder but convicting her of voluntary manslaughter.

The court sentenced Jenkins to 11 years in prison.

## II.    *Brady* Material

During pretrial discovery, the prosecution disclosed that both Brittneeh and Sade Williams had prior juvenile and criminal records, but material from a 2006 juvenile adjudication was not disclosed.

In 2006, the Williams sisters, both juveniles, were declared wards of the court due to their having committed three hate-crime assaults with force likely to produce great bodily injury. (*People v. Emerald R.* (Mar. 4, 2010, B196643), Lexis 1567, [nonpub. opn.].)  The prosecutor failed in her duty to disclose this fact before trial.  (*In re Jenkins*, *supra*, 14 Cal.5th 493.)  (The juveniles in *People v. Emerald* were referred to as "Brit. W." and "Sade W.," which Respondent initially contended failed to establish they were the Williams sisters here.  In the prior proceedings we held this was a fair point but assumed for present purposes that Brit. W. and Sade W. were Brittneeh and Sade Williams.  Respondent now acknowledges they were.)  The

7

prosecutor, Deputy District Attorney Lisa Kassabian, declared in these habeas proceedings that she was unable to obtain further information regarding the disposition of Sade's 2006 detention due to the passage of time and the fact that it was adjudicated as a juvenile matter. Kassabian declared that had she learned of any further information, she would have forwarded it to defense counsel.

The prosecution did provide evidence that in 2015 and 2016 Brittneeh Williams had committed battery on Jenkins, a matter that was disclosed and explored at trial.

The prosecution also provided Sade's RAP sheet, as follows: "Juvenile arrest-10/31/06 arrest for PC 212.5(c), PC 245(a)(l), PC 422.7(a), PC 242 with Long Beach PD- no dispo stated or charges filed[;] 12/21/07 arrest for PC 487(8)(3) with Lakewood PD; convicted PC 487(a) on 02/25/08, case number 8BF00075; 03/07/13 conviction set aside and dismissal granted PC 1203.4."

## III. Habeas Proceedings

Jenkins appealed her conviction and filed the instant habeas petition on October 22, 2019, contending the prosecution's failure to disclose the Williams sisters' 2006 adjudications undermined the verdict. We issued an order to show cause and Respondent filed a return.

We affirmed the judgment on direct appeal and denied the habeas petition.

In ruling on Jenkins's habeas claims, we assumed that "Brit. W." and "Sade W." from the *Emerald R.* opinion were Brittneeh and Sade Williams, that "[i]n 2006, the Williams sisters, both juveniles, were declared wards of the court due to their having committed three hate-crime assaults with force likely to produce great bodily injury," that "the prosecutor should

8

have disclosed the 2006 adjudications to the defense," and that "had Jenkins known of the 2006 adjudications, she would have been able to get them before the jury." (*People v. Jenkins*, *supra*, B294747, pp. 11-13.)

"Even given these . . . assumptions," we held, there was no "reasonable probability that disclosure of the 2006 adjudication would have altered the outcome of the trial" because the jury already knew from other evidence that Williams was an especially violent person, particularly toward Jenkins. (*People v. Jenkins*, *supra*, B294747, p. 13.) Williams had attacked Jenkins three times in the past few years, chased Jenkins in her car, and attacked her at the gas station. Knowing this, the jury still convicted Jenkins of manslaughter. We concluded there was no reasonable probability the jury would have considered the 12-year-old assaults to be the final straw entitling Jenkins to an acquittal. (*Id.* at p. 14.)

As to Sade Williams, we held that the 2006 juvenile adjudication could have been used to impeach her testimony, but "the only material part of Sade's testimony was to the effect that Jenkins was not acting in self-defense when she stabbed Williams." (*People v. Jenkins*, *supra*, B294747, p. 14.) We held that impeachment of Sade on this fact would have been immaterial because the fact "was corroborated by A.V., who testified Jenkins followed Williams to the bus stop to stab her." (*Ibid.*)

Our Supreme Court granted review, reversed the denial of habeas relief, and remanded for further proceedings.

The Court held that "[i]n light of the Attorney General's admittedly deficient litigation practices in the Court of Appeal, as well as [the high court's] clarification of the Attorney General's

9

disclosure duties," we should reconsider the petition upon a more complete record "prepared in accordance with the principles . . . outlined in [the Supreme Court's] opinion." (*In re Jenkins*, *supra*, 14 Cal.5th at p. 528.)  In remanding, however, the Court "express[ed] no opinion on the merits of [the] petition for writ of habeas corpus," and made no comment on our materiality analyses.  (*Ibid*.)

After remand, Jenkins chose not to amend her original petition, and we issued a new order to show cause on that petition.

## DISCUSSION

Jenkins contends the prosecution violated her due process rights by suppressing material exculpatory evidence, i.e., the 2006 adjudication that Williams and Sade committed three violent assaults.  Jenkins argues the evidence would have supported her self-defense claim and impeached Sade's credibility.

## A. Pertinent Law

"Under *Brady* . . . and its progeny, the prosecution has a constitutional duty to disclose to the defense material exculpatory evidence, including potential impeaching evidence.  The duty extends to evidence known to others acting on the prosecution's behalf, including the police.  [Citations.]  The duty to disclose 'exists even though there has been no request by the accused.'  [Citations.]  For *Brady* purposes, evidence is material if it is reasonably probable its disclosure would alter the outcome of trial.  [Citations.]  [¶]  'There are three components of a true *Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the

10

State, either willfully or inadvertently; and prejudice must have ensued.' " (*People v. Superior Court* (*Johnson*) (2015) 61 Cal.4th 696, 709-710 (*Johnson*).)

"Materiality . . . requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial.' " (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043.) "A defendant instead 'must instead show a "reasonable probability of a different result." ' " (*Ibid.*)

Prosecutorial misconduct constituting federal constitutional error is subject to harmless error analysis under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24: the Attorney General has the burden of proving beyond a reasonable doubt that the error did not contribute to the verdict. (*People v. Bell* (1989) 49 Cal.3d 502, 534.)

**B.    Analysis**

**1.    Evidence of Self-Defense**

Here, nothing in the record suggests that a 12-year-old assault against strangers would show Williams was the initial aggressor against Jenkins more compellingly than other evidence already before the jury. The jury already knew that Williams attacked Jenkins three times in the three years leading up to the final incident and was arrested for one of the attacks and ordered to complete anger management classes. Several sources—Mitchell, Jenkins, and video evidence (to a limited extent)—showed that Williams attacked Jenkins in her car outside her apartment, chased the car on foot and pounded on the car as Jenkins drove away, pursued in her own car, driving erratically

11

with children in both cars, and followed Jenkins to a gas station, where she punched Jenkins through the open window before Mitchell pulled her away.  After Mitchell released her, Williams again charged Jenkins and knocked her down and started hitting her, and again had to be restrained by Mitchell.

The jury thus knew—indeed it was undisputed—that Williams attacked Jenkins three times in 2015 and 2016, and four times on January 19, 2018, overcoming distance and physical barriers to do so.  We see no reasonable probability that knowledge of the 12-year-old attacks toward other parties would have shed more light on Williams's propensity for violence than was already apparent from other, multifarious evidence.  (See *United States v. Agurs* (1976) 427 U.S. 97, 113-114 [no *Brady* violation where evidence of prior adjudications was largely cumulative of evidence already presented at trial of the victim's violent nature].)

To entirely acquit Jenkins the jury would have had to find that her stabbing Williams was objectively reasonable.  (See *People v. Stitely* (2005) 35 Cal.4th 514, 551 ["a homicide is justifiable and noncriminal where the actor possessed both an actual and reasonable belief in the need to defend"].)  In deciding whether a homicide is reasonable, a jury must "consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge.' " (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082-1083.)

Accordingly, the jury was instructed with CALCRIM No. 505, which provides:  "When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what

12

a reasonable person in a similar situation with similar knowledge would have believed."

But evidence of the 2006 assault would have had no bearing on the subjective reasonableness of the stabbing because no evidence suggested Jenkins knew about the assault. Thus, it is not reasonably probable the evidence would have made the difference between a manslaughter conviction and an acquittal. We conclude, therefore, that beyond any reasonable doubt, the prosecution's *Brady* error did not contribute to the verdict.

Jenkins argues this was a close case, as evidenced by the jury's long deliberations and its request for a readback of Sade's testimony. Perhaps, but nothing indicates where the closeness lay. The jury might have struggled over the difference between manslaughter and acquittal, but it equally might have struggled over the difference between murder and manslaughter.

### 2. Impeachment

Jenkins argues that evidence of the Williams sisters' 2006 adjudication could have impeached Sade's testimony. We disagree.

Jenkins's theory is not that Sade's history of violence, which had no element of deceit, indicated she was an untruthful person, but that *Williams's* violent history indicated Sade was untruthful when she testified Williams was nonviolent. If the jury had known Sade lied about that, Jenkins argues, it likely would have disbelieved her other testimony that Jenkins stabbed Williams twice, once when she faced no danger.

For reasons discussed above concerning Williams's seven attacks on Jenkins in 2015, 2016 and 2018, the jury had ample, uncontradicted evidence that Williams was violent.

13

In any event, A.V. corroborated Sade's testimony about the stabbing.  Impeachment evidence is generally material where the witness " ' "supplied the only evidence linking the defendant(s) to the crime," [citations], or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case [citations].  In contrast, a new trial is generally not required when the testimony of the witness is "corroborated by other testimony." ' " (*People v. Salazar*, *supra*, 35 Cal.4th at p. 1050.)

Here, Sade testified that Jenkins was not acting in self-defense when she stabbed Williams.  This fact was corroborated by A.V., who testified Jenkins followed Williams to the bus stop to stab her, after the Williams's initial attack and after Jenkins was out of danger.  Mitchell had pushed Williams to the bus stop while Jenkins was still near her car.  In light of A.V.'s corroboration, it is not reasonably probable that the 2006 juvenile adjudication would have "put the whole case in such a different light as to undermine confidence in the verdict." (*Kyles v. Whitley* (1995) 514 U.S. 419, 435.)

We conclude that undisclosed information concerning the Williams sisters' 2006 juvenile history would not have undermined Sade's credibility regarding Jenkins's self-defense claim, and therefore beyond any reasonable doubt, did not contribute to the verdict.  It might have undermined Sade's testimony that her sister was nonviolent, but the jury already knew that was not true from the evidence admitted at trial regarding three more recent attacks by Williams on Jenkins.

### 3.    Other Claims

Jenkins alleged in her petition, but supports the allegations with no briefing, that:  (1) "Evidence of Brittneeh's prior assault

14

constitutes 'new evidence' within the meaning of" section 1473; (2) Jenkins received ineffective assistance of counsel; and (3) the trial was infected with cumulative prejudice.

We reject the contentions. To support a claim for relief based on new evidence, the evidence must be "sufficient[ly] material and credible [such] that it more likely than not would have changed the outcome of the case." (§ 1473, subd. (b)(1)(C)(i).) As we explain above, it is not reasonably probable that evidence of the Williams sisters' juvenile adjudication would have changed the outcome of the trial.

Similarly, Jenkins's ineffective assistance of counsel claim fails because the prejudice standard for such a claim mirrors the materiality standard of a *Brady* claim. (See *Kyles v. Whitley*, *supra*, 514 U.S. at p. 436 [the *Brady* "formulation of materiality" was "later adopted as the test for prejudice" for an ineffective assistance claim].)

Finally, petitioner's cumulative prejudice claim fails because Jenkins alleges only one error—failure to disclose the 2006 adjudication—albeit sounding in different theories—that the evidence would have both supported her self-defense claim and impeached Sade's credibility. Prejudice accumulates from multiple errors, not multiple theories.

15

## DISPOSITION

The writ is denied and the order to show cause discharged.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.