Filed 10/14/24  P. v. June CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>GLANDROS JUNE, JR.,<br><br>  Defendant and Appellant. | 2d Crim. No. B326181<br>(Super. Ct. No. 2021005899)<br>(Ventura County)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on September 26, 2024, be modified as follows:

1.  On page 5, first full paragraph, the last sentence beginning "Nobody other than" is deleted and the following is inserted in its place:

> The owner of the tattoo parlor, R.W.,[3] testified that nobody other than June had a gun.

_____

[3] R.W. refers to R.W., Sr.

2. On page 5, fifth full paragraph, the third sentence beginning "The owner of" is deleted and the following is inserted in its place:

> R.W. said he was from Ventura Avenue, which June interpreted to mean R.W. was "gang-banging" him.

3. On page 5, fifth full paragraph, the fourth sentence beginning "June said Quiana" is deleted.

There is no change in judgment.
Appellant's petition for rehearing is denied.

GILBERT, P. J.          BALTODANO, J.          CODY, J.

Filed 9/26/24  P. v. June CA2/6 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>GLANDROS JUNE, JR.,<br><br>　　Defendant and Appellant. | 2d Crim. No. B326181<br>(Super. Ct. No. 2021005899)<br>(Ventura County) |

Glandros June, Jr., appeals from the judgment after a jury convicted him of discharge of a firearm with gross negligence (Pen. Code,[1] § 246.3, subd. (a); count 2) in an incident in a Walmart parking lot, and three counts of assault with a firearm (§ 245, subd. (a)(2); counts 9, 10, 11) in an incident a year later at a tattoo parlor.  The jury also found true enhancements of personal use of a firearm (§ 1192.7, subd. (c)(8) for count 2, and § 12022.5, subd. (a) for counts 9, 10, 11) and inflicting great bodily injury (§ 12022.7, subd. (a) for counts 9 and 10), and convicted

---

[1] Undesignated statutory references are to the Penal Code.

him of possession of a firearm by a prohibited person (§ 29805, subd. (a); counts 3, 12). June pleaded guilty to possession of a large capacity magazine (§ 32310, subd. (a); count 4), possession of a firearm by a prohibited person (§ 29805, subd. (a); count 5), and misdemeanor violations of providing false information to a peace officer (§ 148.9, subd. (a); count 6) and resisting a peace officer (§ 148, subd. (a)(1); count 7). June also admitted he was released on bail during commission of counts 4, 5, 9, 10, and 11 (§ 12022.1, subd. (b)). The trial court sentenced him to 21 years in state prison.

June contends: (1) the trial court erroneously excluded evidence relevant to self-defense, (2) the prosecution failed to disclose exculpatory evidence, (3) the trial court erroneously admitted a jail phone call, (4) cumulative error denied him due process, (5) the prosecution violated the California Racial Justice Act of 2020 (RJA; § 745), and (6) the trial court abused its discretion by failing to strike enhancements. We correct errors in the abstract of judgment. In all other respects, we affirm.

FACTUAL AND PROCEDURAL HISTORY

*Walmart parking lot shooting*

*1. Prosecution evidence*

Miah O. posted on social media that Neveah T. had drugged her with methamphetamine. Neveah contacted Miah and threatened to fight her.[2]

In February 2021, Neveah and June, who were dating, entered the wireless store near Walmart in Oxnard where Miah was working. Neveah threw her hands up to challenge Miah to

---

[2] We refer to victims and witnesses by their initials or first name and last initial because some have the same last name, and to avoid confusion. No disrespect is intended.

fight.  At Miah's request, June and Neveah left the store.

Miah phoned her stepmother who was the store manager, Cristal F.  Cristal came to the parking lot outside the store and told June and Neveah to calm down.  Miah's father and her boyfriend, Justin H., then came to the parking lot.

June and Justin walked toward each other and they fought.  Cristal told police that June threw the first punch, but she testified at trial she did not see who swung first.  Others joined the fight and some tried to separate the parties.

June pulled out a handgun and shot Justin in the arm.  June then aimed and fired at "[e]verybody in the crowd."  He ran away, "air shooting" as he ran.  Police recovered seven nine-millimeter shell casings from the scene.

### 2.  *Defendant's testimony*

June testified that Miah falsely accused him and Neveah of drugging and raping her about a month before the Walmart parking lot incident.  In the following weeks, he and Neveah received four or five death threats in text messages.  One text said there was a "GREEN LIGHT" on Neveah.  A "green light" means "to attack somebody if you see them."  June also saw that Neveah received a picture of a gun.  June "didn't think this was that serious due to the fact that [he] didn't do what they were saying [he] did."

June and Neveah went to the wireless store so Neveah could talk to Miah, not to fight her.  June and Neveah left when Miah said she was going to call the police.  Miah then texted Neveah to return.

June and Neveah then walked toward the store to talk to Miah.  He said he had a gun with him because there are frequent shootings and stabbings in Oxnard and he always tried to protect

3

himself.  When they got to the parking lot outside the Walmart store, there were 10 or more people standing outside smiling at him.

Cristal argued with Neveah in the parking lot.  June knew Cristal was a professional boxer.  Justin and Miah's father got out of a car and both hit June.  June knew Miah's father was associated with a gang.

June ran away.  He looked back and saw Neveah on the ground.  Justin, Cristal, and one or two other people were stomping and hitting Neveah.  June was concerned he and Neveah would suffer great bodily injury because he had been "hit really hard" and she was being beaten by men and a professional boxer, "plus the previous pictures of guns and threatening me." June then shot six or seven times at people to defend Neveah.

### 3.  Verdict

The jury was unable to reach a verdict on the charge of assault with a firearm on Justin (§ 245, subd. (a)(2)), and that charge was dismissed.  The jury found June guilty of discharge of a firearm with gross negligence (§ 246.3, subd. (a); count 2) and found true a special allegation that he personally used a firearm (§ 1192.7, subd. (c)(8)).  The jury also found him guilty of possession of a firearm by a prohibited person (§ 29805; count 3).

### Tattoo parlor shooting

### 1.  Prosecution evidence

June has four children with Kendra H.  The day after his birthday in April 2022, June went to a tattoo parlor in Ventura to get a tattoo.  June saw Kendra's sister-in-law Quisha E., and Quisha's sister Quiana E.  June believed that Quisha had previously attempted to get Kendra arrested.

Quisha shook June's hand and introduced him to Quiana,

4

who also shook his hand.  June then got a tattoo that said "stop snitchin'."  A verbal argument later ensued inside the shop.  June swung at Quisha and Quiana, and they backed up.  He then backed up and shot Quiana and Quisha.  Five or six shots were heard.

A customer, Andrew E., was getting a tattoo when he heard "aggressive talking."  When he stood up, June shot him three times.  Nobody other than June had a gun.

A car outside was already running during the shooting.  June ran out of the tattoo parlor and jumped into the car, which sped away.

Quisha suffered a gunshot wound in her right torso.  Quiana suffered gunshot wounds to her gallbladder and colon, and was hospitalized for eight days.  Andrew had bullet wounds to his stomach and finger.  He was in the hospital for 11 days and could not walk for several weeks.

June was arrested the next day.  He had a loaded nine-millimeter handgun in his front pants pocket and a box of ammunition.  He also had minor injuries to his head and lip.  In the detective's opinion, the injuries were not consistent with being attacked by multiple people the day before.

June was also interviewed by police.  He said Quiana shook his hand "really, really hard" and told him he had "a weak-ass handshake."  The owner of the tattoo parlor, R.W.,[3] said he was from "here and here," which June interpreted to mean R.W. was from Ventura Avenue and was "gang-banging" June.  June said Quiana walked by him and he assumed she had a gun.  People in the shop were giving him "weird looks."  He said people had

---

[3] R.W. refers to R.W., Sr.

snitched on his "baby mama" and were mad he was getting the "stop snitchin' " tattoo.

June said four to six people attacked him and were "swinging at" him. Someone hit him in the head with a bottle and he started bleeding. He said an unknown person then shot a gun.

June said Quiana was right in front of him, and he shot her in the stomach. He then shot a "big guy" who had hit him earlier. June said he was defending himself. He said he only fired two shots. He was not just "spraying rounds," but shot those who attacked him. He ran out to a car but did not know whose car it was or who was driving.

## 2. *Defendant's testimony*

June testified he was upset because Quisha previously lied about Kendra having a gun while holding a baby and got her arrested. When June met Quiana at the tattoo parlor, he thought she was "a really tough girl." He knew she had just gotten out of prison but did not think she was a gang member.

While June was getting his tattoo, Quiana passed him "grabbing her waist like she had a gun." She said, "What's up, fool."

When a friend of June's was about to leave the tattoo parlor, June asked him to stay because "they're tripping on me." Quiana ran up to June with her fists balled and yelled, "Who's trippin'?"

People attacked June from the back. Someone broke a bottle over his head and stabbed him in the head with it. Someone hit his lip, which caused scars. Someone also shot at him.

June shot Andrew because Andrew was attacking him. June shot Quiana because she was trying to hurt him. He feared

6

for his life.  He denied shooting Quisha.

### 3.  Verdict

The jury acquitted June of attempted murder of Quiana.
The jury found him guilty of assault with a firearm on Quiana,
Andrew, and Quisha.  (§ 245, subd. (a)(2); counts 9, 10, 11).  The
jury found true special allegations that he personally used a
firearm as to all three counts (§ 12022.5, subd. (a)) and that he
inflicted great bodily injury on Quiana and Andrew (§ 12022.7,
subd. (a)).  The jury also found him guilty of possession of a
firearm by a prohibited person (§ 29805; count 12).

## DISCUSSION

### *Exclusion of evidence*

June contends the trial court abused its discretion by
excluding evidence relevant to his claim of self-defense: a texted
photo of a gun, details of Quiana's prior gang conviction, and
R.W.'s possession of a gun.  We are not persuaded.

### 1.  Photo of gun

June testified that Neveah received a picture of a gun.  In
closing argument, the prosecution said the picture of the gun did
not exist and it was "made [up] by the defendant while on the
stand."

After a full day of jury deliberations, defense counsel
announced he had just received from Kendra a copy of a text
message, purportedly sent by Miah to Neveah, that said in part,
"I can come at u however I want . . . .  Ur done."  Accompanying
the text was a picture of a gun.  Counsel stated the text exchange
occurred "immediately *after* the shooting" near Walmart.  (Italics
added.)  He said he had been in contact with Kendra throughout
the trial and had received pictures introduced at trial from
Kendra and Neveah.

7

Counsel asked to reopen the evidence, or for a mistrial or new trial. He made an offer of proof that June could testify he saw this text on Neveah's phone *before* his use of force. Counsel said his office had three investigators working on the case and he sent the text to the prosecution as soon as he received it.

The prosecution argued that Miah had been released from her subpoena, and could not be brought back without a long delay. The prosecution also argued the evidence lacked foundation because the text did not have a date, the phone number did not correspond to Miah or Neveah or anyone related to June, and the text could have been created by Kendra. The court denied defense counsel's requests because it shared "some of the admissibility concerns," the text should have been obtained earlier through due diligence, and the "extraordinary measure" of reopening the evidence was not warranted.

" 'A "motion to reopen [is] one addressed to the [trial] court's sound discretion." [Citation.] In determining whether an abuse of discretion occurred, the reviewing court considers four factors: " '(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence.' " [Citation.]' " (*People v. Masters* (2016) 62 Cal.4th 1019, 1069; see §§ 1093, 1094.)

We conclude there was no abuse of discretion. A request to reopen after a day of deliberations is "an extremely late stage in the proceedings." (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1520.) The defense was in contact with Kendra and Neveah throughout the trial and, in light of the testimony about the text, could have requested it earlier. If the court had interrupted

8

deliberations to present this one piece of evidence, the jury would likely accord it undue importance. And even if June were able to establish a foundation for the evidence, it "was far from critical" (*id.* at p. 1521) in light of the issues regarding its source, defense counsel's representation that the text exchange occurred "immediately *after* the shooting," and June's admission he "didn't think this was that serious."

### 2. *Details of gang prior*

June contends the trial court erred by not allowing detailed evidence regarding Quiana's prior gang conviction to support his claim of self-defense when he shot multiple people at the tattoo parlor.

Gang Detective Anthony Reginato initially testified for the prosecution that neither Quisha nor Quiana were gang members or associates. But when recalled by the defense, Reginato testified he had not previously reviewed reports of Quiana's 2011 Ventura County conviction for second degree robbery with a gang allegation (§ 186.22, subd. (b)), her Santa Barbara County conviction for assault for the benefit of a gang and being a gang member, or photographs of Quisha and Quiana flashing gang signs. After defense counsel had him review those documents, Reginato testified the convictions were too old to change his opinion, but based on the photographs, he now believed Quisha and Quiana were Ventura Avenue gang associates.

The defense sought to question Reginato about facts from the 2011 Ventura County case, i.e., that Quiana attacked someone for badmouthing the gang and said, "Ventura Avenue gangsters, don't fuck with us." The trial court excluded it based on the age of the incident and the absence of evidence June was aware of it.

9

The court may exclude evidence if "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) We review the exclusion of evidence for abuse of discretion. (*People v. Montes* (2014) 58 Cal.4th 809, 869.)

We conclude there was no abuse of discretion. Detailed evidence regarding Quiana's prior gang conviction was not relevant to June's claimed need for self-defense because he was not aware of it. Thus, Quiana's statements in the 2011 case had little if any probative value because they "had no connection" to June's conduct on the day of the crimes. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 227 [gang members' prior threats to kill police officers irrelevant to charged crimes against others].)

### 3. *R.W.'s gun possession*

During jury selection, the defense learned information from June's mother, documented in an email. June's mother said she overheard part of a conversation between R.W. and a prosecutor in the back of a courtroom. R.W. reportedly asked why he had to come back to court and asked, "Just because I had a gun in the drawer?" June's mother said the prosecutor responded "something to the effect of not to talk about it or to come back here."

Four days after the email, R.W. testified he did not have a gun during the tattoo parlor shooting. The defense did not question him about the purported courtroom conversation. Four days after that, the defense forwarded the email to the prosecutor.

After the prosecution rested its case, the defense sought to

10

recall R.W. to inquire about the comment, both to impeach his credibility, and to support June's claim that he acted in self-defense because he said he saw a gun. The prosecutor told the court she spoke to R.W. in the back of a courtroom about three weeks before trial. He did not want to be ordered back to court, but she did not hear him say anything about a gun in a drawer. She added that if the statement were admitted into evidence, she would need to testify that he did not say that.

The court denied the request to recall R.W. The court noted R.W.'s credibility had already "been impeached plenty," and the presence of a gun in a drawer that June was not aware of would not support his claim of self-defense.

June's only claim that he saw a gun pertained to Quiana, and he later admitted he just *assumed* she had one. We agree that whether R.W. had a gun in a drawer at some point, or said he did, was of limited probative value. In our view, the trial court did not abuse its discretion in excluding the evidence. (Evid. Code, § 352; *People v. Montes*, *supra*, 58 Cal.4th at p. 869.)

*Failure to disclose evidence*

June contends he was denied due process because the prosecution failed to disclose its purported conversation with R.W. about a gun in a drawer. We disagree.

Due process is violated by the prosecution's suppression of material exculpatory evidence known to the prosecutor or investigators acting on the government's behalf, with or without a request by the accused. (*Brady v. Maryland* (1963) 373 U.S. 83, 87; *People v. Salazar* (2005) 35 Cal.4th 1031, 1042.) "[A] violation occurs ' "only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different," i.e., " 'a probability sufficient to "undermine[]

11

confidence in the outcome" on the part of the reviewing court.' " (*Salazar*, at p. 1050.)

June has not shown a *Brady* violation because the record does not establish that "the prosecutor knew, or should have known," of the purported statement. (*People v. Whalen* (2013) 56 Cal.4th 1, 67.) On the contrary, the prosecutor stated she heard no such statement.

Moreover, there was no suppression of evidence because the statement from June's mother was disclosed during the trial, " 'at a time when the disclosure would be of value to the accused.' " (*People v. Superior Court (Meraz)* (2008) 163 Cal.App.4th 28, 51; *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 467.) June's mother's statement was disclosed before the prosecution called R.W. as a witness, and could have been used for cross-examination. It does not matter for *Brady* purposes that the defense received the evidence from a source other than the prosecution because the evidence was "in [the] defendant's possession." (*People v. Salazar*, *supra*, 35 Cal.4th at p. 1049.)

### *Jail phone call*

June contends the court abused its discretion in admitting a recording of a portion of a telephone call he made from jail to a friend which undermined his claim of self-defense. We are not persuaded.

In the recording, June said: " 'Cause, uh, 'cause, uh, I brought the gun. Bagged some shit in there like, oh, you can't—so, say I start a problem with somebody and then, you know, and I fuckin' kick those n----s and they hit me back and I pull out a gun or whatever. And then, dude, you know that, that, that's not self-defense because I started it. You know. But, uh, that's, that's my case like, um, I was reading some like

12

(UNINTELLIGIBLE) What the fuck?  Like that's what people do, though."

The trial court did not abuse its discretion.  In our view, June's statement was probative to the claim of self-defense, was not inflammatory, did not suggest June committed other offenses, and was not unduly prejudicial.  (Evid. Code, § 352; *People v. Kraft* (2000) 23 Cal.4th 978, 1035.)

Nor was the statement inadmissible because it was ambiguous.  June testified he consistently told friends and family he acted in self-defense.  He denied he "start[ed] something" or struck the first blow.  He also said he was speaking "hypothetically" based on cases in the law library.  It was the jury's role to evaluate the conflicting interpretations and determine the meaning of June's statements.  (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1035.)

June also contends the statement was taken out of context.  (See Evid. Code, § 356.)  We disagree because June does not claim the trial court refused to admit other statements or portions of statements that would provide such context.

### Cumulative error

June contends that cumulative errors constitute prejudicial error.  We disagree because we conclude June received due process and a fair trial.  (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.)

### Racial Justice Act

June is Black.  He contends the prosecutor violated the RJA when during trial she referred to the mother of his children as his "baby mama," and during sentencing proceedings described his conduct in the shootings as "wilding."

The RJA prohibits a conviction or sentence based on race,

ethnicity, or national origin. (§ 745, subd. (a).) A violation may be shown if during trial an attorney "used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful." (§ 745, subd. (a)(2).)

During closing argument, the prosecutor said June was upset because Miah posted on social media that June and Neveah drugged and raped her. The prosecutor said, "That's telling the world something that happened that the defendant didn't want the world to hear about his girlfriend. Not his baby mama. His girlfriend Neveah."

The prosecutor also referred to Kendra as "baby mama," outside the presence of the jury, while arguing the admissibility of an audio recording that referred to her being put into custody. The prosecutor used the phrase a third time, again outside the presence of the jury, when she opposed the defense request to introduce the text message containing the photograph of the gun. She said, "So for all we know, it was baby mama who provided this, Kendra, to the defense." The defense did not object in any of these instances.

June's sentencing brief stated he was "a family man" who "lives for his fiancée and children." At the sentencing hearing, the prosecutor responded: "Well, if he had chosen to spend time with his family instead of wilding with Neveah in the Walmart parking lot, we wouldn't be here. If he had chosen to spend his birthday with his then pregnant girlfriend [Kendra] instead of drinking and wilding in Ventura with his getaway driver and five friends, we wouldn't be here. Now that he's being held responsible for his actions, his family becomes of great

14

importance, his fiancee becomes the center of his attention. But that wasn't the case when he was committing crimes."

Defense counsel said, "the way the DA is saying the word 'wilding' . . . is offensive and racist in my opinion." The prosecutor responded that "wilding" was "what the defendant did . . . [he] wasn't simply going and smacking someone. He shot at multiple times at multiple people at multiple venues."

Defense counsel did not file a motion in the trial court to claim a violation of the RJA, as provided in section 745, subdivisions (b) and (c). Defense counsel's only references to the RJA were for sentencing, i.e., conclusory statements that multiple enhancements would have a discriminatory racial impact, and a claim that the punishment was cruel and unusual.

We conclude June forfeited his claim under the RJA. "[T]he Legislature did not intend to allow a defendant to pursue [an RJA] claim for the first time on direct appeal where it could have been but was not raised in the trial court." (*People v. Lashon* (2024) 98 Cal.App.5th 804, 813; *People v. Singh* (2024) 103 Cal.App.5th 76, 112-116 (*Singh*).) Had June made a timely motion showing a prima facie violation, the trial court would have held a hearing at which it could consider expert testimony and other evidence (§ 745, subd. (c)) and "allow the parties to fully litigate the issue" (*Lashon*, at p. 814).

We also conclude that June's failure to file a motion pursuant to the RJA did not constitute ineffective assistance of counsel. A defendant alleging ineffective assistance must prove (1) deficient performance, and (2) resulting prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) We need not address both prongs of this test. If a defendant fails to establish either prong, the claim should be denied. (*Id*. at p. 697.)

15

To show prejudice, June must show a "reasonable probability" that a motion filed pursuant to the RJA would have been granted. (*Singh*, *supra*, 103 Cal.App.5th at pp. 118, 120.) But because the record below was not sufficiently developed (§ 745, subd. (c)(1)), we cannot speculate as to whether the trial court would have found, by a preponderance of the evidence, that the prosecutor's statements "exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin," or was a use of "racially discriminatory language about the defendant's race, ethnicity, or national origin." (§ 745, subds. (a)(1) & (2), (c)(2), (h)(4); *Singh*, at p. 117.) June's ineffective assistance of counsel claim fails.

*Sentencing enhancements*

June contends the trial court abused its discretion when it failed to strike the sentencing enhancements. We disagree.

The court sentenced June to the low term of two years for count 9, and consecutive terms of one year each for counts 10 and 11, and eight months each for counts 2, 3, 4, 5, and 12. The court imposed the low term enhancement of three years for personal use of a firearm for count 9, and consecutive terms of 16 months each for two other firearm enhancements. The court imposed a total of four years consecutive for great bodily injury allegations and four years for on-bail enhancements. No additional time was imposed for the misdemeanors (counts 6 and 7).

Section 1385 enables trial courts to dismiss enhancements in furtherance of justice. Senate Bill No. 81 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1), which was in effect at the time of sentencing, requires the court to "consider and afford great weight" to certain mitigating circumstances. (§ 1385, subd. (c)(2).) "Proof of the presence of one or more of these

16

circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (*Ibid.*) We review denial of a motion to dismiss sentence enhancements for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 374.)

June contends several mitigating circumstances required the court to dismiss the enhancements: discriminatory racial impact, multiple enhancements, enhancements could result in a sentence exceeding 20 years, mental illness, and childhood trauma. (§ 1385, subd. (c)(2)(A)-(E).)

Although June's sentencing memorandum stated that imposition of enhancements would have a discriminatory racial impact, he made no showing that the sentence was "longer or more severe" than that "imposed on similarly situated individuals convicted of the same offense." (§§ 745, subd. (a)(4)(B), 1385, subd. (c)(2)(A).) Counsel's anecdotal examples about the race of defendants he and his associates recently defended did not establish a violation of the RJA.

Despite the seemingly mandatory language that multiple enhancements beyond a single enhancement (§ 1385, subd. (c)(2)(B)) or enhancements that could result in a sentence of over 20 years (§ 1385, subd. (c)(2)(C)) "shall be dismissed," the trial court retained discretion to impose the enhancements if dismissal would endanger public safety. (§ 1385, subd. (c)(2); *People v. Anderson* (2023) 88 Cal.App.5th 233, 239-241, review granted Apr. 19, 2023, S278786; *People v. Mendoza* (2023) 88 Cal.App.5th 287, 291, 296-297.) The trial court here found that dismissal of

enhancements "would endanger public safety as the defendant is not only a threat to the multiple people he shot in this case but the public at large as well."  This finding is supported by substantial evidence, including June's prohibited possession of firearms, and his shooting of four unarmed individuals in two unrelated incidents, with the second incident occurring while on bail.

June also contends the enhancements should have been dismissed because "[t]he current offense is connected to mental illness."  (§ 1385, subd. (c)(2)(D).)  Although he did not cite this provision in the trial court, he presented documentation that mentioned depression.  He also contends "[t]he current offense is connected to prior victimization or childhood trauma."  (§ 1385, subd. (c)(2)(E).)  June's parents separated when he was five and he was raised in unsafe neighborhoods by a single mother who was often absent.  He began using marijuana and alcohol during adolescence.  He was attacked at age 14, "which left him with a damaged shoulder and trauma stemming from his perceived inability to defend himself and by extension his mother and loved ones."  Even if June were able to show these factors were connected to his commission of the offenses, the trial court did not abuse its discretion in imposing the enhancements based on substantial evidence of his risk to public safety.

Absent a clear showing that the trial court's refusal to dismiss an enhancement was "irrational or arbitrary," we presume the court " ' "acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' "  (*People v. Carmony*, *supra*, 33 Cal.4th at pp. 376-377.)  An abuse of discretion may occur where the trial court is not aware of its

18

discretion, considers impermissible factors, fails to consider relevant factors, or where the decision is so irrational or arbitrary that no reasonable person could agree with it. (*Id.* at pp. 377-378.) No such showing has been made here.

*Abstract of judgment*

Without opposition, respondent requests correction of the abstract of judgment. The minute order shows $700 due for unspecified "Fees," but the abstract does not specify the mandatory imposition of a court facilities assessment of $300 (Gov. Code, § 70373) and a court operations assessment of $400 (§ 1465.8, subd. (a)). We order the abstract corrected to reflect these fees, and to show that he was convicted of counts 4 and 5 by plea rather than by jury. (§ 1260.)

DISPOSITION

We order the abstract of judgment to be corrected to show a $300 court facilities assessment (Gov. Code, § 70373) and a $400 court operations assessment (§ 1465.8, subd. (a)), and to show that June was convicted of counts 4 and 5 by plea. The trial court shall prepare an amended abstract of judgment and send a certified copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.


BALTODANO, J.

We concur:



GILBERT, P. J.                    CODY, J.


19

David M. Hirsch, Judge

Superior Court County of Ventura

_____

Arielle Bases, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.