Filed 3/12/25  P. v. Parkerson CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Amador)

----

| | |
|---|---|
| THE PEOPLE, | C100942 |
| Plaintiff and Appellant, | (Super. Ct. No. 23CR32743) |
| v. | |
| JONATHAN DEAN PARKERSON, | |
| Defendant and Respondent. | |

The People appeal from the trial court's judgment of dismissal following its finding of a violation under *Brady v. Maryland* (1963) 373 U.S. 83.  We reverse the judgment of dismissal and further conclude that defendant Jonathan Dean Parkerson may be retried on remand should the People choose to do so.

**FACTS AND PROCEEDINGS**

*Charged Offenses*

The People filed a complaint alleging defendant had committed felony violations of assault by means of force likely to produce great bodily injury (Pen. Code, § 245,

1

subd. (a)(4); count I),[1] with an enhancement allegation of great bodily injury (§ 12022.7, subd. (a)), and battery causing serious bodily injury (§ 243, subd. (d); count II).[2]  He was arraigned on the complaint and entered a plea of not guilty; a preliminary hearing was set within the statutory time limit.

*Preliminary Hearing*

Victim C.H. testified at the preliminary hearing on June 23, 2023.

As of December 14, 2022, she and defendant had been roommates for approximately eight months.  On or about Tuesday, December 13, 2022, defendant wanted C.H. to drink alcohol with him in the living room, but she declined and went to her room and watched a movie.  The next thing she remembered, she woke up Thursday afternoon feeling pain in her head, legs, and back.  She went to the bathroom and saw that her face was bruised.  She asked defendant, "What the hell?" to which he replied, "Look at my head."  C.H. saw that defendant had scratches on his head.  Soon after regaining consciousness on Thursday afternoon, C.H. contacted law enforcement.

C.H. had suffered a fractured shoulder and a fractured back, the right side of her face was black and blue, her eye was swollen shut, she had bumps all over her head, her body was sore, and she had difficulty walking.  As a result of the injuries she had sustained, she had trouble remembering.  C.H. met with the prosecutor and an investigator from the district attorney's office about two weeks before the hearing, at which time she said she had no memory of the event.  She still did not remember what had happened to her.

---

[1]  Further undesignated statutory references are to the Penal Code.

[2]  The People had initially charged defendant with felony assault with a deadly weapon (§ 245, subd. (a)(1)), and felony battery with serious bodily injury (§ 243, subd. (d)). Following the receipt of additional medical records, the People dismissed that complaint and refiled the case, as described.

C.H. testified that the framing on her bedroom door was broken and on her bedroom floor, there were holes in her bedroom door, and her closet door was knocked off its hinges. She testified that she "believe[d] [defendant] used his walking stick," but this was stricken on the basis that her testimony was speculative. She and defendant were the only ones in the house between Tuesday evening and when she woke up on Thursday.

Deputy Brandon Paul Dacier testified at the preliminary hearing that he took a statement from C.H. on December 15, 2022. He recalled that C.H. was "very frantic and scared," and "seemed like she was in shock"; she had a swollen eye and significant bruising to her face. C.H. told him that defendant wanted her to drink with him the night before, she refused and went to her bedroom to watch a movie, and defendant came into her room and damaged her closet door and hit her in the head and face with a piece of firewood four or five times until she was unconscious. C.H. did not tell Dacier that she had any back or leg pain. Defendant told Dacier that C.H. had battered *him*, and Dacier observed that defendant was injured.

Based on his investigation, Dacier determined that defendant had attacked C.H. Because C.H. had cuts on her forehead, Dacier believed her injuries had been inflicted by a weapon, rather than a fist or hand. Although he located several pieces of firewood, none appeared to have been used in the attack, and he could not determine what weapon defendant had used. The pieces of firewood were "decently sized logs or firewood" and were about two-feet long; some had jagged edges, and "quite a few" had nails in them. Dacier did not observe puncture wounds in C.H.'s face consistent with having been hit by a nail. Dacier identified blood on the floor of the home, but C.H. told him it was a dog's blood, and he did not collect a sample.

C.H.'s medical records were admitted into evidence.

The trial court held defendant to answer for both counts alleged in the complaint. The court noted C.H.'s testimony that she saw no evidence that anyone had been in the house from Tuesday evening until she woke up on Thursday. It observed that C.H. told

3

Dacier in her initial statement that defendant had hit her, which differed from her testimony at the preliminary hearing, but the inconsistency could be attributed to the lapse of time as well as her head injury and her inability to recall. Finally, the court found C.H.'s medical records were sufficient to establish great bodily injury to her head and eyes.

Defendant was arraigned on the first amended information on the same two charges with an added enhancement to count I for use of a deadly weapon (§ 12022, subd. (b)(1)). The case proceeded to jury trial.

*Jury Trial*

At trial, evidence was presented that while at the hospital, C.H. complained of head injuries and back and neck pain caused by the assault. She was diagnosed with acute head injury with loss of consciousness, thoracic bone fractures, and periorbital hematoma, described as bruising and swelling around the eyes. Blunt force trauma with loss of consciousness could cause headaches and memory loss, and C.H.'s diagnosis was not inconsistent with a concussion.

Dacier testified at trial. When he initially contacted C.H., her right eye was completely swollen shut and dark purple, and she appeared frantic, scared, excited, and terrified of defendant and did not want to be near him. C.H. told him that after she had fallen asleep while watching a movie, "she was awoken to the defendant coming into her bedroom, breaking her closet door, and then . . . striking her with an object described as a log or a pole." C.H. said that defendant had "beat the shit out of her," and that defendant struck her four to five times, causing her to lose consciousness. Dacier concluded that a weapon had been used to cause C.H.'s injuries. C.H. did not initially state that the weapon was firewood, but agreed with Dacier that the weapon was a piece of firewood after he specifically asked her. Dacier examined the firewood in the house, but did not discover any indication that firewood had been used as the weapon. Two photographs of the firewood were admitted into evidence. Dacier testified, "[a]side from blood drops on

4

the floor, I didn't really notice anything as far as the room goes. I noticed it was very clean, like she cleaned up." He agreed that the closet door was off the rails and leaned up against the wall or the other closet door.

C.H. testified on March 19, 2024. On Tuesday--the day of the alleged assault--defendant wanted to get drunk with her, but she declined. She took cold medicine because she was sick, watched part of a movie, fell asleep, and woke up on Thursday afternoon with pain and bruising. C.H. suffered injuries from the assault, including a fractured back, a dislocated shoulder, "busted up" kneecaps, had difficulty walking for two weeks after the incident, the inability to see out of one of her eyes for two months, and memory loss.

C.H. confronted defendant and said, " 'You've got to be kidding me, what,' " to which defendant replied, " 'Well look at my head.' " She testified that defendant had hit her with "[a] madrone walking stick." On cross-examination, C.H. denied that she told Dacier in her initial statement that she had been struck by a pole, and she did not recall Dacier picking up a piece of firewood and asking her if it was similar to what defendant struck her with. Instead, she recalled bringing the madrone walking stick to the sheriff's department after she got back from the hospital. She agreed that she did not mention the walking stick during her initial statement to Dacier but testified that she was not asked about it. She realized defendant had hit her with the walking stick after coming home from the hospital. When she later found the walking stick, she brought it to the sheriff's department and told them it was the weapon defendant used. She was told it was not needed, and "[i]t got thrown in the dumpster right outside." She did not remember with whom she met. She could not recall whether she told anyone at the district attorney's office that defendant had hit her with a walking stick.

On cross-examination, C.H. acknowledged she had no memory of the assault. She testified that while she did not recall defendant coming into her bedroom, her bedroom door had been knocked down, defendant was the only person in the house, and he had

5

admitted that he assaulted her. She added that there were holes the size of defendant's walking stick in the door, although she did not hear defendant banging on her door with a walking stick.

After the jury had been dismissed for the day, Dacier informed Chief Assistant District Attorney Sherri Adams and district attorney investigator FooSum that he had met with C.H. at the sheriff's department when she brought in the walking stick. Adams instructed Deputy District Attorney Victoria Fernandez, who was trying the case, to recall Dacier the following morning to ask him why he did not take custody of the walking stick.

The following day, March 20, the People recalled Dacier as their first witness. Dacier testified that he saw defendant using a brown walking stick at the scene of the alleged assault on December 15, 2022. The walking stick was approximately three or four feet tall and two inches in diameter. He did not collect the walking stick when he saw defendant using it because it had not been mentioned previously, and he did not think it was necessary. C.H. brought what appeared to be the same walking stick to the sheriff's department at a later date and advised him that it was the stick defendant used in the assault. He did not seize the walking stick because there had been "a pretty big gap of time since the incident," C.H. did not mention at the time of the incident that the walking stick was the weapon, he had already filed his police report, and it "didn't seem necessary to take it." C.H. left with the walking stick.

During Dacier's testimony, defense counsel requested that the case be dismissed due to a *Brady* violation. The trial court ordered briefing on the issue.

6

*Defendant's Motion to Dismiss*

Defendant filed a motion to dismiss pursuant to *Brady, Trombetta*[3] and *Giglio*[4]. The People timely opposed the motion.

The trial court held a hearing on the motion to dismiss on March 21. Dacier testified that C.H. had come to the sheriff's department about two days after the incident with a walking stick she alleged defendant had used to assault her. The stick was approximately three to four feet tall, brown, an inch or two in diameter, and smooth. Dacier did not ask her why she believed the walking stick was the weapon used against her because when he had initially asked her what kind of weapon he used, she had first told him that defendant had beat her with poles (which he understood to mean metal poles), and then told him the weapon was a piece of firewood or a log. He had found some logs and pieces of firewood near the fireplace and showed them to C.H., and she had agreed that was what defendant had used. Dacier did not discover any evidence on any of the firewood that would suggest it had been used in the attack. He did not seize the walking stick when he met with C.H. at the sheriff's department because she had not mentioned the walking stick in her initial statement; he clarified that because she had difficulty recalling what happened on the day of the attack, he understood her to be speculating about the weapon used in the attack. Dacier saw defendant with the walking stick on December 15, 2022--the date of C.H.'s initial statement--but he did not seize it because he did not think it had any evidentiary value. The walking stick defendant used and the walking stick C.H. brought to the sheriff's department appeared to look the same. Dacier did not write a supplemental report regarding his interaction with C.H. at the sheriff's department because he did not seize the walking stick, the walking stick had not previously been mentioned, and C.H. was not certain that the walking stick was the

---

[3] *California v. Trombetta* (1984) 467 U.S. 479.

[4] *Giglio v. United States* (1972) 405 U.S. 150.

7

weapon defendant used. Dacier did not decline to take the walking stick or document that C.H. brought it to the sheriff's department to intentionally hurt defendant's position or to deprive him of exculpatory evidence.

Dacier did not recall if he ever told anyone at the district attorney's office about his encounter with C.H. prior to the first day of trial (March 19). He recalled discussing it with Fernandez immediately after trial finished for the day on March 19, and he told Adams and FooSum about it after that, during a meeting at the district attorney's office.

The trial court sought clarification about whether Dacier told anyone at the district attorney's office about the walking stick prior to March 19. Dacier responded: "Your Honor, I -- it's very possible that I did. I do not remember exactly if I did or not. I remember district attorney -- Deputy District Attorney Morgan Hendley was on the case at first. I do not recall if I brought it up or we talked about it or discussed it then. I know for a fact I told them on Tuesday after [C.H.] took the stand. I would be lying if I said I did or did not before then."

Adams also testified at the hearing. She recalled asking Dacier to come to the district attorney's office from about 5:30 p.m. until after 6:00 p.m. on March 19 to assist with something else. During that meeting, Dacier said that he met with C.H. when she brought the walking stick to the sheriff's department. This was the first time Adams had heard this information, and she did not know if anyone else in the office had heard it. After learning of Dacier's meeting with C.H., Adams left a note for Fernandez to recall Dacier and ask him why he did not collect the walking stick from C.H.

*Trial Court Orders*

On March 21, following argument by the parties, the trial court found two *Brady* violations: (1) the pre-preliminary hearing failure to "disclose impeachment evidence" after C.H. brought the walking stick to the sheriff's department, and (2) the withholding of that information on March 19 (when the People learned of Dacier's meeting with C.H.

8

and "did not disclose it to the defense"). The court declared a mistrial and indicated that it would issue a ruling as to the appropriate remedy on April 5.

On April 2, the People filed supplemental points and authorities and a request for reconsideration.

On April 3, the trial court issued a written order finding that Dacier committed a *Brady* violation before the preliminary hearing by failing to disclose exculpatory and material evidence, thus depriving defendant of due process at that hearing.[5] The court denied defendant's motion to dismiss, found the *Brady* violation was not flagrant or intentional, and concluded that due process required a new preliminary hearing. Accordingly, the court set aside the holding order, struck the information, and ordered a new preliminary hearing. The court did not determine whether the People had committed a *Brady* violation by failing to disclose the information when they learned of it on March 19.

The People filed an ex parte motion for a hearing on their request for reconsideration, which the trial court granted.

On April 12, the trial court struck its April 3 order and issued an amended order granting defendant's motion to dismiss based on *Brady*.[6] The court found: "This case arose out of an incident in which [C.H.] alleges the defendant inflicted injury on multiple parts of her body on or about December 15, 2022. In body-worn camera footage [C.H.] is seen and heard telling Deputy Dacier that she was beaten with a piece of firewood. No specific piece of firewood was identified as the weapon, so no firewood was retained by the investigating officer.

_____

[5] The trial court denied defendant's motions to dismiss pursuant to *Giglio* and *Trombetta*.

[6] As to defendant's *Trombetta* claim, the court concluded defendant was not prejudiced by the failure to retain the walking stick because a sufficient description of the walking stick had been provided to permit the defense to proceed in its absence.

9

"At preliminary hearing on June 23, 2023[,] Deputy Dacier testified that according to [C.H.], she was hit with a piece of firewood. [C.H.] testified that she believed she was hit with a walking stick. A speculation objection was sustained and [C.H.]'s testimony was stricken from the record. Defendant was held to answer . . . .

"At trial on March 19, 2024, Deputy Dacier again testified that according to [C.H.], her injuries were inflicted by a piece of firewood. [C.H.] testified that she was hit with a madrone walking stick. She further testified that at some point she brought the walking stick to the sheriff's department and told an unknown person the stick was the weapon used to inflict her injuries. She further testified that the person took the stick and threw it away.

"After court adjourned on March 19, 2024[,] Deputy Dacier told Chief Assistant Sherri Adams that he was the person [C.H.] spoke with approximately two days after the incident. The prosecution did not inform defense of this impeachment information upon learning it but instead Ms. Adams instructed trial counsel Deputy Fernandez to recall Deputy Dacier to elicit impeachment testimony.

"On March 20, 2024[,] the trial convened and Deputy Dacier testified that approximately two days after the incident, [C.H.] brought the walking stick to him saying it was the weapon used. He did not retain the walking stick or write a supplemental report because, in essence, he found her credibility suspect.

"Upon hearing Deputy Dacier's testimony the defense alleged *Brady* violations. The matter was briefed by both parties and argument heard on March 21, 2024."

In granting defendant's motion to dismiss, the trial court observed that when Dacier testified at the preliminary hearing that C.H. had told him the weapon was a piece of firewood, he was aware that she had also said the weapon was a walking stick. The court reasoned this information could have been used to impeach Dacier and C.H. Additionally, Dacier testified that he did not write a supplemental report because he

10

questioned C.H.'s credibility; the court noted that an investigator's questioning the credibility of the prosecution's sole witness is exculpatory evidence.

The trial court interpreted Dacier's testimony to conclude that he believed he had disclosed impeachment information to the People at some point between the preliminary hearing and trial, and credited this testimony, concluding that Dacier did not violate *Brady*. The court then opined that the People apparently knew of the impeachment information and failed to further investigate or disclose it to the defense before trial. Rather than disclosing the information to the defense, the People elected to recall Dacier to impeach him. The court concluded there were significant due process implications where C.H. made a statement to Dacier that was neither memorialized in a supplemental report nor conveyed to the defense until he took the stand.

The People timely filed a notice of appeal. The case was fully briefed in December 2024 and was assigned to the current panel at the end of that month.

## DISCUSSION

### I

### *Brady Violation*

The People challenge the trial court's order dismissing the charges against defendant on the basis that no *Brady* violation occurred. As we will explain, we agree.

A. *Legal Background*

"In *Brady*, the United States Supreme Court held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' [Citation.] The high court has extended the prosecutor's duty to encompass the disclosure of material evidence, even if the defense made no request concerning the evidence. [Citation.] The duty encompasses impeachment evidence as well as exculpatory evidence." (*People v. Hoyos* (2007) 41 Cal.4th 872, 917, abrogated on other grounds by *People v. McKinnon* (2011) 52 Cal.4th 610.)

11

" 'There are three components of a true *Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043 (*Salazar*).)

"The first element of a *Brady* claim is that the evidence be favorable to the accused." (*Salazar*, *supra*, 35 Cal.4th at p. 1047.)  " 'For *Brady* purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness.' " (*People v. Cordova* (2015) 62 Cal.4th 104, 123; see *City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 8 [duty to disclose encompasses impeachment evidence]; *People v. Superior Court (Meraz)* (2008) 163 Cal.App.4th 28, 52 [duty to disclose encompasses both exculpatory and impeachment evidence].)

"The second element of a *Brady* claim is that the evidence must have been 'suppressed' by the government.  [Citation.]  Although the prosecution may not withhold favorable and material evidence from the defense, neither does it have the duty to conduct the defendant's investigation for him.  [Citation.]  If the material evidence is in a defendant's possession or is available to a defendant through the exercise of due diligence, then, at least as far as evidence is concerned, the defendant has all that is necessary to ensure a fair trial, even if the prosecution is not the source of the evidence. [Citations.]  Accordingly, evidence is not suppressed unless the defendant was actually unaware of it and could not have discovered it ' "by the exercise of reasonable diligence." ' " (*Salazar*, *supra*, 35 Cal.4th at pp. 1048-1049.)

The third element of a *Brady* claim is prejudice, which requires a showing that the evidence was material.  (See *People v. Lucas* (2014) 60 Cal.4th 153, 274 [the prejudice that must ensue for a true *Brady* violation to occur "focuses on 'the materiality of the evidence to the issue of guilt or innocence' "]; *In re Sodersten* (2007) 146 Cal.App.4th 1163, 1228 [equating a showing that evidence is favorable and material to a showing of

prejudice].)  A constitutional violation occurs " ' "only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different." [Citations.]  The requisite "reasonable probability" is a probability sufficient to "undermine[] confidence in the outcome" on the part of the reviewing court.' " (*Salazar*, *supra*, 35 Cal.4th at p. 1050.)

" 'The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.' " (*People v. Hoyos*, *supra*, 41 Cal.4th at p. 922.)  "In the case of impeachment evidence, materiality requires more than a showing that 'using the suppressed evidence to discredit a witness's testimony "might have changed the outcome of the trial" [citation].' [Citation.]  Rather, the evidence will be held to be material 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " (*People v. Lucas*, *supra*, 60 Cal.4th at p. 274, italics omitted.)  "Speculation does not constitute a probability." (*People v. Superior Court (Meraz)*, *supra*, 163 Cal.App.4th at p. 53, fn. 12.)  "Defendant has the burden of showing materiality." (*Hoyos*, at p. 918.)

"In determining whether evidence is material under this standard, we consider ' "the effect of the nondisclosure on defense investigations and trial strategies." ' " (*People v. Williams* (2013) 58 Cal.4th 197, 256.)

"We independently review the question whether a *Brady* violation has occurred, but give great weight to any trial court findings of fact that are supported by substantial evidence." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176.)

B.  *Trial Court's Findings*

In support of its order granting defendant's motion to dismiss, the trial court found that C.H. had told Dacier in her initial statement that she was beaten by a piece of firewood, but that no specific piece of firewood was identified as the weapon.  That finding, although supported by substantial evidence, is incomplete.  In her initial

statement, C.H. first asserted that she was beaten by a pole, and subsequently agreed with Dacier's suggestion that she was beaten with a piece of firewood.

We agree with the trial court's observation that at the preliminary hearing, Dacier testified that C.H. had told him she was hit with a piece of firewood while C.H. testified she was beaten with a walking stick, which was stricken as speculative.

The trial court then found that Dacier testified at trial that C.H. told him her injuries were inflicted by a piece of firewood. That finding is also incomplete. Dacier first testified that C.H. told him she was struck with "an object described as a log or a pole." He then clarified that C.H. initially stated that she was struck by a pole, and later agreed with his suggestion that she might have been struck by a piece of firewood. We agree with the court's observation that C.H. testified at trial that she was beaten with a madrone walking stick, and that she had brought the stick to the sheriff's department and told an unknown person that the stick was used to inflict her injuries.

The trial court then found that C.H. testified the person with whom she met took the stick and threw it away; that finding is not supported by substantial evidence. C.H. testified that the person she spoke to at the sheriff's department told her they did not need the walking stick, and "[i]t got thrown in the dumpster right outside." Dacier subsequently testified that C.H. left with the walking stick, indicating that someone other than Dacier, if anyone, threw the stick in the dumpster.

The trial court also found that Dacier testified at trial that he did not retain the walking stick or write a supplemental report "because, in essence, he found her credibility suspect." But Dacier testified that he did not collect the stick because C.H. did not mention it before, there was "a pretty big gap of time since the incident," and he "didn't feel it was necessary." While Dacier's testimony about his reasons for not collecting the stick were admissible, his opinion of C.H.'s credibility, if any, was inadmissible. (See, e.g., *People v. Sergill* (1982) 138 Cal.App.3d 34, 39-40 [neither lay nor expert witnesses may express opinions regarding witness credibility].)

In determining that the People, but specifically not Dacier, had committed a *Brady* violation, the court found Dacier had credibly testified that he had disclosed the impeachment information to the People at some point between the preliminary hearing and trial. That finding is not supported by the evidence. At the hearing on the motion to dismiss, Dacier testified that it was "very possible" that he told someone at the district attorney's office about the walking stick before March 19, *but he did not remember if he had*, and he "*would be lying if [he] said [he] did or did not*." (Italics added.) Whether credible or not, Dacier clearly did not testify that he informed the prosecution about the walking stick before trial.

C. *Analysis*

In finding the People had committed a *Brady* violation and granting defendant's motion to dismiss, the trial court concluded the evidence of Dacier's encounter with C.H. at the sheriff's department could have been used to impeach the testimony of both Dacier and C.H., and that Dacier's questioning of C.H.'s credibility constituted exculpatory evidence.[7] Consistent with the trial court's ruling, defendant argues on appeal that the fact that C.H. had identified the walking stick as the weapon was evidence impeaching her prior statements to Dacier that defendant wielded poles or a pole, her prior statement as reflected in her medical record that he used a "kindling stick," or her trial testimony that she did not recall the assault.

First, both C.H. and Dacier testified at trial about the walking stick encounter, and thus defendant was able to impeach both witnesses with their prior inconsistent statements. Accordingly, it does not appear the evidence was actually "suppressed" as

---

[7] As we described *ante*, the trial court determined that the People but not Dacier had committed a *Brady* violation based on an unsupported factual finding. The distinction is immaterial because the prosecutor's duty to disclose under *Brady* extends to the "prosecution team," including investigating police officers. (*Kyles v. Whitley* (1995) 514 U.S. 419, 437-438; *IAR Systems Software, Inc. v. Superior Court* (2017) 12 Cal.App.5th 503, 514.)

15

defined by relevant caselaw. " '[E]vidence that is presented at trial is not considered suppressed, regardless of whether or not it had previously been disclosed during discovery.' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 281, quoting *People v. Morrison* (2004) 34 Cal.4th 698, 715.)

Second, to the extent the evidence of their encounter could properly be considered suppressed, the evidence was not material. Any impeachment value of the evidence that C.H. told Dacier she was struck by a walking stick two days after reporting her assault was minimal. C.H. had previously advanced no fewer than three other implements as the weapon, and she acknowledged that she did not remember what happened on the night of the alleged assault. Accordingly, her credibility as to the nature of the weapon had already been impeached by her various inconsistent statements and her stated inability to recall the events in question. Adding one more inconsistent statement to the mix was not reasonably probable to result in a more favorable outcome for defendant.

Further, the evidence that C.H. had previously asserted that the walking stick was the weapon was *consistent* with her trial testimony as well as her (stricken) preliminary hearing testimony. She testified *at trial* that the walking stick was the weapon, and she expressly denied telling Dacier that she had previously said poles or firewood were the weapons used.

With respect to using the evidence of the encounter to impeach Dacier's trial testimony, we do not see how the evidence at issue here--that C.H. had identified yet another possible weapon wielded by defendant--was material impeachment evidence as to Dacier. Although it is possible the evidence could have been used to challenge Dacier's testimony that C.H. had told him the weapon was a piece of firewood, he had already testified that C.H. had first asserted she was attacked by poles, and only later agreed with his suggestion that the weapon could have been firewood. Dacier also acknowledged that none of the firewood he identified appeared to have been used as the weapon, and he did not affirmatively identify the firewood as the weapon. Additionally,

16

as we discussed *ante*, it was made clear at trial that C.H. had advanced several different possible weapons as the weapon used, while also acknowledging that she did not remember the alleged attack.

Defendant argues that evidence of the encounter between C.H. and Dacier could have been presented to show that Dacier declined to seize the walking stick on the basis that he did not believe C.H.'s claim. However, as we have discussed, his opinion about C.H.'s credibility was inadmissible. (See, e.g., *People v. Sergill*, *supra*, 138 Cal.App.3d at pp. 39-40 [neither lay nor expert witnesses may express opinions regarding witness credibility].) Further, Dacier *did* testify at trial that he did not seize the walking stick because he did not think it was needed.

Defendant argues that he was prejudiced because, had evidence of C.H.'s encounter with Dacier been disclosed, their testimony "would have been viewed in a different light." But the evidence *was* presented at trial, and defendant had the opportunity to present the testimony of C.H. and Dacier in the "different light" he argues on appeal was denied him.

Finally, defendant argues that the failure to disclose the walking stick constituted a *Brady* violation because he was not able to test the stick to determine whether any indication could be found that it was used as the weapon.[8] However, this is a version of defendant's motion to dismiss based on *Trombetta*, under which law enforcement agencies must preserve evidence possessing exculpatory value that was apparent before it was destroyed, and is of a type not obtainable by other reasonably available means. (*People v. Fultz* (2021) 69 Cal.App.5th 395, 424; *California v. Trombetta*, *supra*, 467 U.S. at pp. 488-489.) The trial court denied that motion on the basis that a sufficient description of the walking stick was provided to permit the defense to proceed in its absence, and therefore defendant was not prejudiced by the failure to retain the walking

---

[8] The trial court did not find a *Brady* violation on this basis.

stick.  The People did not appeal from that ruling, which was in their favor, and defendant did not cross-appeal from that ruling.  We therefore have no basis to reconsider the trial court's ruling as to the retention of the walking stick.

Based on the foregoing, we conclude no *Brady* error occurred.  Evidence of the encounter between C.H. and Dacier two days after C.H.'s initial statement was presented at trial, and therefore was not suppressed, and was not material.

## II

### *Double Jeopardy*

"Article I, section 13, of the California Constitution declares that 'No person shall be twice put in jeopardy for the same offense . . . .' " (*Curry v. Superior Court* (1970) 2 Cal.3d 707, 712.)  Our high court has concluded:  "(1) jeopardy attaches when a defendant is placed on trial in a court of competent jurisdiction, on a valid accusatory pleading, before a jury duly impaneled and sworn, and (2) a discharge of that jury without a verdict is equivalent in law to an acquittal and bars a retrial, unless the defendant consented thereto or legal necessity required it."  (*Ibid.*; see *People v. Hernandez* (2003) 30 Cal.4th 1, 8 [retrial precluded where trial court grants an unnecessary mistrial after jeopardy has attached].)

Here, jeopardy had attached.  There was a valid accusation, the jury had been chosen, and the trial court declared a mistrial during the trial.  Accordingly, the issue before us is whether defendant consented to a mistrial or the discharge of the jury.

On March 20, after Dacier testified about the exchange with C.H. two days after the incident, defendant requested to approach the bench, and an unreported discussion occurred.  Following that discussion, the jury was excused, and defendant orally moved for dismissal due to a *Brady* violation.  The court ordered briefing on the issue, and defendant filed a written motion to dismiss.  Defendant then argued for dismissal at the hearing on March 21.  During that hearing, the district attorney observed that the court "had indicated in chambers" that it intended to declare a mistrial.  The People "strongly

18

object[ed]" to a mistrial. Defendant did not articulate a position on whether a mistrial was appropriate. Following its ruling that two *Brady* violations had occurred, the court declared a mistrial and dismissed the jury. The court noted that while it was declaring a mistrial, it did not dismiss the case at that time and would issue a ruling at a later date. Defendant did not object.

The People contend defendant impliedly consented to the mistrial. They argue that the court reasonably believed defendant (through counsel) consented to the declaration of a mistrial given counsel's conduct, that counsel was aware or should have been aware that she had given the court that impression, and counsel was presented with the opportunity to disabuse the court of that belief but failed to do so. Defendant responds only that he did not impliedly consent to a mistrial merely because he expressly requested dismissal.

We conclude defendant impliedly consented to the discharge of the jury prior to a verdict by moving for midtrial dismissal of the charges against him. In *People v. Finch* (1953) 119 Cal.App.2d Supp. 892, 899, the court recognized, "When the dismissal [of the jury] is the result of the defendant's prodding, as here, the situation created, that is, a trial that does not culminate in either an acquittal or a conviction, is of his doing, and . . . he has waived his right to defend on the ground that he was once in jeopardy." Citing *Finch*, the court in *People v. Ramirez* (1972) 27 Cal.App.3d 660, 669 observed that retrial is not barred if a defendant "moves in open court to dismiss the indictment based on substantive grounds." In other words, although defendant did not expressly move for a *mistrial*, his midtrial request for *dismissal* created the situation where the trial culminated with neither acquittal nor conviction. As such, he waived his right against double jeopardy, and he may be retried on remand should the People choose to do so.

19

**DISPOSITION**

The judgment of dismissal is reversed.

/s/

Duarte, J.

We concur:

/s/

Earl, P. J.

/s/

Renner, J.